UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 95-10527
_____

JOHN FEARANCE, JR.,

                                        Petitioner-Appellant,

                    versus

WAYNE SCOTT, DIRECTOR TEXAS
DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

June 18, 1995

On Application for Certificate of
Probable Cause and Motion for Stay of Execution

Before JONES, DUHÉ and WIENER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

        Appellant Fearance has been tried and sentenced to death
twice for stabbing Larry Faircloth nineteen times and causing him
to bleed to death in his own bedroom, during Fearance's aborted
burglary.  This court rejected Fearance's first federal habeas
petition and denied a certificate of probable cause to appeal only
three months ago.  Following his third collateral trip through the
state courts, Fearance filed for § 2254 habeas relief in the
federal district court for the second time.  Fearance has now

reemerged before this court, three working days before his scheduled execution, again searching for a stay of execution and application for certificate of probable cause to appeal. Concluding that he has not alleged grounds for relief that are reasonably debatable among jurists, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4, 103 S.Ct. 3383, 3395 n.4 (1983), because his claims are clearly foreclosed, we must deny CPC and decline to issue a last-minute stay of execution.

Fundamentally, Fearance asserts two new grounds for relief that were not conclusively rejected by this court in <u>Fearance v. Scott</u>, No. 94-10686 (5th Cir. March 21, 1995)(Fearance I). First, he argues that the State of Texas would violate the Eighth Amendment's prohibition of cruel and unusual punishment by executing him after "forc[ing] him to endure over a decade on death row." This is a claim that could and should have been asserted in his first federal petition. Second, he raises a series of challenges related to his mental competency for execution. We hold that Fearance's previous litigation strategy has barred most of these claims from review on the merits, and that he is presently mentally competent to be executed.

## I. <u>Unconstitutional Delay</u>

In his third state habeas petition filed May 25, 1995, Fearance first raised an Eighth Amendment based challenge to the "extended" delay of Texas in executing his sentence of death. He asserts that his claim that Texas has forfeited its right to execute him because of the "inordinate delay" between his first

2

trial in 1978 and final issuance of the Court of Criminal Appeals mandate in July, 1989 derives from the memorandum opinion issued by Justice Stevens in the Supreme Court's denial of <u>certiorari</u> in <u>Lackey v. Texas</u>, 115 S.Ct. 1421 (1995). He further buttresses the support for this proposition with additional historical research and by extrapolating from the Supreme Court's order granting a stay and vacating this court's opinion in <u>Lackey v. Scott</u>, 52 F.3d 98 (5th Cir. 1995). <u>See</u> <u>Lackey v. Scott</u>, 115 S.Ct. 1818 (1995).[1]

Fearance first petitioned the federal courts for relief in 1992. In that proceeding he did not assert a claim that the Eighth Amendment barred recourse to the death penalty after a defendant's extended incarceration on death row. Accordingly, the State of Texas urges that the federal abuse-of-the-writ doctrine precludes review of the merits of this claim.

Rule 9(b) of the Rules Governing § 2254 Habeas Proceedings authorizes a federal court to dismiss a serial habeas petition if failure to assert new grounds in a prior petition amounted to an abuse of the writ. <u>McCleskey v. Zant</u>, 499 U.S. 467, 490 (1991), held that "the same standard used to determine whether to excuse state procedural defaults should govern the determination of inexcusable neglect in the abuse-of-the-writ context." Hence "a claim in a serial habeas petition must be dismissed as an abuse of the writ unless the petitioner demonstrates that there was 'cause'

---

[1] This decision covers Fearance's points 3, 4 and 5 in his application for certificate of probable cause filed in this court. We do not, however, reach the question whether the relief he seeks for allegedly unconstitutional delay would be precluded by <u>Teague v. Lane</u>, 489 U.S. 288 (1989).

not to have raised the claim in a previous federal habeas petition, and 'prejudice' if the court fails to consider the new claim." James v. Cain, 50 F.3d 1327, 1331 (5th Cir. 1995).[2] In Selvage v. Collins, 975 F.2d 131, 133 (5th Cir. 1992), cert. denied, 113 S.Ct. 2445 (1993), we concluded that a failure to raise a claim in an earlier habeas petition may not be excused for cause "if the claim was reasonably available" at the time of the first petition. We explicitly highlighted the Supreme Court's admonition in Engle v. Isaac, 456 U.S. 107, 129-130 (1982), that claims are "reasonably available" even where their assertion would in all likelihood be "futile." Thus, "an omission of a claim [in an earlier habeas petition] may be excused for cause only if the question was so novel that it lacked a reasonable basis in existing law." James, 50 F.3d at 1331 (quoting Selvage, 975 F.2d at 135) (alterations in original). A "reasonable basis" demands only that counsel has the tools "to formulate a constitutional question." Id. (citation omitted). By definition, therefore, if "other defense counsel have perceived and litigated [a] claim", cause for a serial petition is not possible. Engle, 456 U.S. at 134.

Although Fearance attempts to link the advent of a "Lackey"-claim to the date of Justice Stevens's recent memorandum, this historical revisionism is transparently erroneous. "[W]hile Justice Stevens' memorandum in Lackey has given prominence to the argument that delay in carrying out the death sentence constitutes

---

[2] Or, in the alternative, he asserts that a "fundamental miscarriage of justice" would result from the failure to entertain his claim on the merits. McCleskey, 499 U.S. at 494-495. This argument is considered infra.

cruel and unusual punishment, the legal theory underlying the claim is not new." McKenzie v. Day, 1995 U.S. App. LEXIS 11196, at *9 (9th Cir. May 9, 1995) opinion adopted, 1995 U.S. LEXIS 10893 (9th Cir. May 9, 1995) (en banc), cert. denied, 115 S.Ct. ___ (1995); Turner v. Jabe, 1995 U.S. App. LEXIS 12522, at *6-*7 (4th Cir. May 24, 1995).

Indeed, the Ninth Circuit explicitly rejected Fearance's precise claim on the merits in 1990.[3] Richmond v. Lewis, 948 F.2d 1473 (9th Cir. 1990).[4] As Engle explained, "Even those decisions rejecting the defendant's claim, of course, show that the issue had been perceived by other defendants and that it was a live one in the courts at the time." Engle, 456 U.S. at 133 n.41. In fact, this argument had been raised decades before Fearance's 1992 federal petition. See Chessman v. Dickson, 275 F.2d 604, 607 (9th Cir. 1960) (application for CPC "because [petitioner] has been confined in a death cell for eleven and one-half years, thus he has been subjected to cruel and unusual punishment").

Moreover, Fearance's attempt to defend Justice Stevens's comment proves too much. In over 20 pages of briefing he endeavors to trace the merits of a Lackey-claim back to the views of this nation's founding fathers and the pre-revolutionary English common

---

[3] Interestingly, Richmond's petition in district court raising this challenge was filed in 1984.

[4] This opinion was eventually vacated by the panel. See 986 F.2d 1583 (9th Cir. 1993).

law.[5]  For contemporary support, he directs attention to the British Privy Council's landmark decision in Pratt v. Attorney General for Jamaica, 2A.C.1, 4A11E.R.769 (P.C. 1993) (en banc), which held that a delay between petitioner's deaths sentence and his execution violated the Jamaican constitution.  We agree with the Fourth Circuit's conclusion that if Fearance "wishes to cite the Privy Council he must acknowledge that in 1983 the Privy Council rejected, over a dissent, a constitutional attack based on the delay between a death sentence and execution."  Turner, 1995 U.S. LEXIS 12522, at *9.  This alone suffices to preclude "cause" for Fearance's omission of a cruel and unusual punishment claim from his first federal habeas petition.  See Delo v. Stokes, 495 U.S. 320, 322 (1990) (per curiam) (prior dissenting opinions discussing the claim refuted petitioner's argument that his claim was novel).[6]

Because Fearance is unable to establish cause, his abuse of the writ will be excused only if he can show that federal review of his claim is necessary to prevent a fundamental miscarriage of justice.  We reject -- as have three other circuits[7] -- Fearance's attempt to expand "the narrow scope of the fundamental miscarriage

---

[5]    Fearance  even provides "relevant passages" from Blackstone's Commentaries on the Laws of England (5th ed. 1773).

[6]    Additionally, Justice Liacos of the Supreme Judicial Council of Massachusetts argued in a 1980 concurrence that capital punishment violated the state constitution due to the delay between sentencing and execution.  District Atty. for Suffolk Dist. v. Watson, 411 N.E.2d 1274, 1289-95 (1980) (Liacos, J., concurring).

[7]    See Turner, 1995 U.S. LEXIS 12522 at *22; McKenzie, 1995 U.S. APP. LEXIS 11196, *14 n.11; Porter v. Singletary, 49 F.3d 1483, 1485 (11th Cir. 1995) (per curiam).

of justice exception."  <u>Sawyer v. Whitley</u>, 112 S.Ct. 2514, 2519 (1992).   The Supreme Court has applied the "actual innocence" exception <u>only</u> where a petitioner claims to be actually innocent of the crime for which he was convicted, <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986), or where a petitioner claims to be actually innocent of his death sentence.  <u>Sawyer</u>, 112 S.Ct. at 2519-25.

Citing <u>Sawyer</u>, Fearance argues that he is now actually innocent of the death penalty, or technically that he is "constitutionally *ineligible*" as a result of the state's delay in executing his sentence.   The special <u>Sawyer</u>-version of the "miscarriage of justice" exception is limited to assertions of errors of constitutional magnitude occurring at sentencing.   The language of <u>Sawyer</u> demanding the petitioner "show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found him eligible for the death penalty under applicable state law," 112 S.Ct. at 2523, cannot logically be exported to other "defects" in a death sentence. Fearance cannot identify any error at his sentencing -- and most assuredly is not "actually innocent" of capital murder.

Furthermore, even assuming a valid <u>Lackey</u>-claim is conceptually possible,[8] the execution of a murderer whose crime otherwise merited the death sentence would not rise to the level of a fundamental miscarriage of justice.  <u>See</u> <u>McKenzie</u>, 1995 U.S. APP. LEXIS 11196, *18 ("[I]t is unclear to us whether, even if it were

---

[8]      <u>But see</u>, <u>McKenzie</u>, 1995 U.S. App. LEXIS 10893, *2 (<u>Lackey</u>-type claim a "mockery"); <u>Turner</u>, 1995 U.S. App. LEXIS 12522, *22 (Luttig, concurring) (<u>Lackey</u>-claim "frivolous," "sophistic" and "political game").

held that delay in the imposition of the death penalty constitutes cruel and unusual punishment, commutation of the death penalty will turn out to be the appropriate remedy.") According to Fearance's own theory, he has already suffered the cruel and unusual punishment occasioned by delay; executing him immediately would not add to *this* type of punishment.

Finally, we resent Fearance's attempt to manipulate the record for the purpose of presenting an "attractive" Lackey-claim to courts that are willing to indulge such arguments. Although he did commit his offense in 1977 and has not yet been executed, Fearance suggests that this "inordinate delay [was] not attributable to his own conduct." (emphasis in original). In contrast, the state trial court adopted the following chronology as historical fact:

> This offense occurred on December 23, 1977. [Fearance] was first convicted and assessed the death penalty on July 8, 1978, barely six months after the offense. [Fearance's] first appeal to the Court of Criminal Appeals asserted forty-five grounds for review and resulted in a reversal and remand of his case for a new trial on September 17, 1980, based upon Supreme Court precedent, Adams v. Texas, 448 U.S. 38 (1980), not issued until nearly 2 years after his trial. [Fearance] presumably benefited from the delay, because he had received a resolution of his appeal prior to issuance of Adams, his first conviction presumably would have been affirmed, and he would have been executed. [Fearance] filed a motion for rehearing after the remand for a new trial, which was denied on May 27, 1981.
>
> [Fearance] received a second trial, and he was convicted and sentenced to death for the second time of October 21, 1981, only five months after his motion for rehearing was denied. [Fearance] thereafter appealed again to the Court of Criminal Appeals, this time asserting twenty-four points of error, all of which were eventually found by the Court of Criminal Appeals to be meritless. Significantly, [Fearance] filed a plea to the

8

jurisdiction to attempt to delay the second trial and then contended without success in that second direct appeal that the trial court re-tried him too soon, before certiorari was denied on his original appeal, and that the trial court therefore lacked jurisdiction. 771 S.W.2d at 495.

[Fearance] filed a motion for new trial after the second conviction, which was denied in a bare two weeks. The record of this second trial was not completed and filed with the Court of Criminal Appeals until August 3, 1982, nearly ten months after the trial, and apparently without objection by [Fearance]. [Fearance] thereafter moved for multiple extensions to file his brief, and he did not file the brief until April 28, 1983, one-and-one-half years after the second jury verdict. The State thereafter filed its reply brief to [Fearance's] twenty-four points of error in December 1983, after filing a single extension motion to which [Fearance] lodged no objection. The Court of Criminal Appeals thereafter held the case for five years after which it issued a published opinion nearly 30 pages in length addressing [Fearance's] points of error. [Fearance] lodged no objection with the Court of Criminal Appeals during this five year delay, nor did he file any motions to expedite the appeal. When the conviction was affirmed, [Fearance] filed a motion for rehearing, which was denied in approximately two months' time. [Fearance] thereafter petitioned the Supreme Court for writ of certiorari, which was denied July 3, 1989.

The Court of Criminal Appeals issued its mandate on July 6, 1989, after which, on July 31, 1989, the trial court set an execution date of October 18, 1989. [Fearance's] counsel filed the first application for state habeas corpus on October 3, 1989, over three months after certiorari was denied, over two months after the execution date was set, and only two weeks prior to the October 18, 1989 execution date. The trial court was obliged to modify the execution date in order to appoint experts and hold an evidentiary hearing on [Fearance's] claims of mental disease and incompetence. After a protracted hearing, an amended application by [Fearance] filed January 18, 1990, and testimony by numerous experts, see this Court's Findings of Fact and Conclusions of Law, cause no. W81-11256-K(A), this Court found that there was no definitive evidence of mental disease. This Court also found that [Fearance] had been found by mental health experts to be aware that incompetence claims could delay his execution and to be "malingering." This Court issued its findings in November, 1990, after [Fearance] filed his brief with the

9

Court on May 11, 1990, asserting competence and Penry claims. The Court of Criminal Appeals thereafter held the case for resolution of these claims for approximately ten months, after staying the January 1991 execution date, and again [Fearance] filed no objection to the delay, nor did he file any motions to expedite review of the writ application.

[Fearance] thereafter filed a second state habeas application on January 16, 1992, over four months after his first application was denied by the Court of Criminal Appeals. The trial court issued its findings on this application 33 days after it was filed, and the Court of Criminal Appeals denied the application two weeks later.

The trial court having set a new execution date of March 20, 1992, [Fearance] filed a petition for habeas corpus with the U.S. District Court, which was denied by the federal district court on July 6, 1994, again with no complaint by [Fearance] regarding delay in resolving the appeal. On March 21, 1995, the Fifth Circuit Court of Appeals denied [Fearance] a certificate of probable cause to appeal the federal district court's decision, and on March 31, 1995, this Court set the current execution date of June 20, 1995, [Fearance] filed a motion to delay the current execution date in order to allow him more time to prepare a petition for writ of certiorari on the federal habeas corpus petition, although the deadline for filing that certiorari petition is June 19, 1995, prior to the execution date. Only after this Court denied [Fearance's] motion to further delay his execution did [Fearance's] attorneys announce their intention to file this application for habeas corpus, and the application was in fact not filed until three weeks later, less than one month before the current execution date, along with a motion for evidentiary hearing and for re-appointment of the same mental health expert who examined [Fearance] five years ago. This application was the first pleading in nearly seventeen years of appeals in which [Fearance] has raised his current claim -- that his appeal has lasted too long.

This course of events is supported by the record, has not been disputed by Fearance, and must be presumed correct on federal habeas review. 28 U.S.C. § 2254(d). What it shows is that Fearance was not the unwilling victim of a Bleak House - like procedural system hopelessly bogged down; at every turn, he,

10

without complaining about the accumulating period on death row, sought extensions of time, hearings and reconsiderations.

Moreover, Fearance's current death sentence was not assessed until October 1981, at the conclusion of his second trial. He never faced an execution date until October 1989, after his second conviction was affirmed, because Texas state law precluded the trial court from setting an execution date while his direct appeal was pending. See Tex. Code Crim. Proc. Ann. art. 42.04 ("When a defendant is sentenced to death, no date shall be set for the execution until after the receipt by the clerk of the trial court of the mandate of affirmance of the court of criminal appeals.).

## II.

Fearance also argues that his application for CPC should be granted because, under Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595 (1986), he is presently incompetent to be executed. (Claims I and 2 in Fearance's application for CPC in this court) To the extent that his assorted challenges rest on objections to forced medication, we hold them to be procedurally barred from our review. We will, however, consider Fearance's assertion that his present mental illness renders him constitutionally unfit for the death penalty.

A. Present Competence

Nonetheless, our settled precedent compels us to conclude that no constitutional barrier exists to executing the petitioner in his present state. Indeed, this was the conclusion reached by

11

the district judge in Fearance's initial round of federal habeas corpus review. See Fearance v. Collins, No. 3:92-CV-0488-X (N.D. Tex. July 6, 1994). Of course, this court would normally refuse to revisit claims raised in a prior federal petition absent "cause and prejudice."[9] Because Ford claims, however, concern the petitioner's immediate mental state, neither this court nor the Supreme Court has definitively decided whether relief would appropriately be denied on either abuse of the writ or successive petition grounds. See Barnard v. Collins, 13 F.3d 871, 878 (5th Cir. 1994).[10]

This does not mean that the federal district court should have held an evidentiary hearing on Fearance's sanity. Instead, the state habeas court concluded a hearing vis à vis petitioner's competence to be executed within the last three weeks. "This court has previously determined that a state court's finding of competency to be executed is entitled to a presumption of correctness under § 2254(d)." Barnard, 13 F.3d at 877 (citation omitted).

Although Fearance contends that the state court's refusal to appoint a forensic expert destroys this presumption, he fails to provide any authority that such a decision impels the conclusion that the state court did not "afford a full and fair hearing." To

_____

[9]In his first appeal from the denial of federal habeas relief, Fearance specifically declined to challenge the court's rejection of his Ford v. Wainwright claim. See Fearance I, at 18 n.8.

[10] We do not mean to imply that we accept the Ninth Circuit's opinion in Campbell v. Blodgett, 997 F.2d 512, 524 (9th Cir. 1993).

the contrary, the record amply supports the trial court's conclusion that Fearance meets the operative definition of competency for purpose of execution.

In Lowenfield v. Butler, 843 F.2d 183, 187 (5th Cir. 1987), this court adopted the standard enunciated by Justice Powell as the Ford criterion. Accordingly, all we require is "that a person know the fact of his impending execution and the reason for it." Barnard, 13 F.3d at 876 n.2 (citation omitted). Fearance's own testimony on June 2, 1995, in the state court is sufficient to meet this threshold. Petitioner testified that he knew the date scheduled for his execution, the date of the offense for which he was on death row, that he was sentenced to die for murdering Larry Faircloth, and that the murder was alleged to have occurred during the course of a burglary. See Transcript of State Habeas Hearing at 57-58, 70-72.

In addition to this presumption of correctness, the federal habeas court, with a petitioner who was either judged competent to stand trial or did not raise a serious issue for the trial court of his mental capacity, may "presume that [Fearance] remains sane at the time sentence is carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." Lowenfield, 843 F.2d at 187, citing Ford v. Wainwright, 477 U.S. at 425-426 (Powell, J.,concurring). This court specifically held that a doctor's "conclusion" that the petitioner "suffer[s] from paranoid schizophrenia falls woefully short of a finding that [petitioner] is so deranged that he is unaware that he

13

is about to be put to death as a result of his earlier conviction and sentence for murder."

There was also no reason for the federal district court to have appointed a psychiatrist or ordered an independent psychiatric examination, pursuant to 21 U.S.C. [sec.] 848(q)(B)(9). Keeney v. Tamayo-Reyes, 112 S.Ct. 1715, 1720-21 (1992), demands that Fearance establish "cause and prejudice" for his failure to develop in state court the facts necessary to support his federal petition. Both prongs present an obstacle for Fearance; prejudice would be difficult -- if not impossible -- to establish where petitioner's own testimony evinces awareness surpassing our circuit's competency test, and cause is lacking where petitioner does not avail himself of the express opportunity to subpoena prison medical health professionals who had treated Fearance. In state court, the judge repeatedly admonished Fearance's counsel that he could subpoena TDC doctors who have handled Fearance's psychiatric care for over ten years.[11] The state court did, however, admit and consider the voluminous TDC medical records concerning Fearance's care.

Further, it borders on disingenuousness for Fearance to assert in a motion filed less than one month before his scheduled execution that because he is an indigent he is entitled to a court-appointed psychiatric evaluation, and because the court denied his motion, he could not put on his chosen expert. The Texas Resource Center was established to assist prisoners sentenced to death in

---

[11] See Transcript of May 30 - June 2, 1995 State Habeas Hearing at 10, 29, 80-81.

14

Texas. Although the bulk of its funding is from the federal government, it is not prohibited from spending non-federal money to assist prisoners in state habeas proceedings. According to its 1993 Annual Report, the Resource Center received about $570,000 in that year from non-federal sources. The funding levels have not declined. Most of the 400 Texas death row inmates are not at any given time actively litigating their cases. Surely some of the Center's non-federal money was available for an updated psychiatric report of Dr. Crowder in support of Fearance's motion. See Petitioner's Offer of Proof, State Habeas Hearing at 10, 79-83. Keeney barred the federal district court from conducting another evidentiary hearing.

B. Forced Medication

Fearance's sudden assertion that his execution is foreclosed because of "his forced medication with a powerful antipsychotic drug" stands on wholly different grounds.[12] Specifically, he argues to this court that it should issue a CPC because the question of whether forced medication to induce or ensure competence for execution has not been directly addressed by

---

[12] Significantly, there is a serious dispute over whether Fearance has been medicated involuntarily. Apparently, Fearance has not objected to being medicated for treatment in more than six months. See Medical Records, Attached Exhibit to State Habeas Hearing. Furthermore, Fearance has on occasion requested medication, and his only recent complaints have focused on his preference for the Haldol pills rather than injections. In response to his complaints, he has been switched to Haldol liquid which he takes orally. Most importantly, Fearance, albeit voicing objections to the form of medication, ultimately acquiesced to the medication in each instance. See State Court Transcript at 61-63, 68. The state court made no specific written finding, however, on this question.

15

the United States Supreme Court. Fearance acknowledges that the Court has considered related issues of forcible medication in Washington v. Harper, 499 U.S. 210 (1990), and Riggins v. Nevada, 112 S. Ct. 1810 (1992), and suggests that two state Supreme Court decisions indicate that the question is debatable among jurists of reason.[13] (Notably, both cases rest on privacy provisions in the state constitution.)

Albeit an interesting and important issue, Fearance has no vehicle to present it for our determination at this last moment. Although he did include the issue in his latest, i.e., third, collateral petition in state court filed on May 25, 1995, he omitted any similar concern from his second state petition filed in 1992.[14] Not surprisingly, the state trial court faced with Fearance's third application for writ of habeas corpus found that the "claims advanced in this application could -- and should -- have been litigated . . . in the first or second application for writ of habeas corpus." The court explicitly found that Fearance "abused the habeas corpus process by raising these claims in a dilatory fashion," and, in the alternative,[15] refused to consider these new contentions. The Court of Criminal Appeals denied relief

---

[13] He directs our attention to State v. Penry, 610 So.2d 746, 755 (La. 1992) (per Dennis, J.) and Singleton v. State, 437 S.E.2d 53, 60-61 (S.C. 1993).

[14] Obviously, no such claim was included in his first state habeas petition filed originally in 1989, and amended on January 18, 1990.

[15] The district court also denied relief on the basis that the medical records indicate that Fearance is medicated for his own therapeutic purposes and to prevent him from presenting a danger to himself and to others. Riggins v. Nevada, 112 S.Ct. 1810, 1815 (1992), permits an inmate to be treated with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."

16

and in a brief order adopted all of the conclusions of the state district court.

Accordingly, this court is barred from reviewing the merits of Fearance's forced medication claims: The adequate and independent state ground doctrine "bar[s] federal habeas when a state court decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman v. Thompson, 111 S. Ct. 2546, 2554 (1991).[16]

To be sure, this court has stated that in the past Texas courts have not regularly and strictly applied abuse-of-the-writ rules. Lowe v. Scott, 48 F.3d 873, 876 (5th Cir. 1995). Nevertheless, in Ex Parte Barber, 879 S.W.2d 889, 892 n.1 (Tex. Cr. App. 1994), cert. denied, 115 S.Ct. 739 (1995), the highest court of the State of Texas announced that it would as a "rule" dismiss as abuse of the writ "an applicant for a subsequent writ of habeas corpus rais[ing] issues that existed at the time of his first writ."[17] Consequently, when the state district court dismissed an issue raised in Fearance's third petition that was not raised in his earlier petition it was no longer acting with any discretion. After Barber, dismissals of Texas habeas petitions as an abuse of the writ should create a procedural bar under the Coleman standard.

---

[16] That the state court addressed the abuse of the writ in the alternative does not alter the analysis. See Coleman, 111 S. Ct. at 2560 (rejecting petitioner's assertion that the federal review of his claims was not barred if "the Court first considered the merits of his federal claims, and applied the procedural bar only after determining that doing so would not abridge one of Coleman's constitutional rights").

[17] The court recognized a "cause" exception.

17

Thus, Fearance must establish "cause" and "prejudice" from our failure to consider his claim.[18]  Coleman, 111 S. Ct. 2565 (cause and prejudice standard "uniformly" applicable to all independent and adequate state procedural defaults).

Recognizing this predicament, Fearance notes that an exception to the abuse of the writ doctrine exists if the claim asserted is novel.  Reed v. Ross, 468 U.S. 1 (1984).  To prevail, Fearance must -- at least -- plausibly argue that this type of constitutional attack was not reasonably available in 1992 when he filed his second state habeas petition.  And, indeed, he does urge this notion.

That the United States Supreme Court granted certiorari on this forcible medication claim in 1990 undermines the respectability of such a proposition.  See Perry v. Louisiana, 494 U.S. 1015 (1990) (trial court ordered administration of antipsychotic drugs to the prisoner for purposes of execution).

Even without such a dramatic siren, reasonably diligent counsel have long had the tools to construct this argument.  As the Louisiana Supreme Court explained in 1992, "For nearly a century it has been well-settled in Louisiana that one who has been convicted of a capital crime and sentenced to suffer the penalty of death, and who thereafter becomes insane, cannot be put to death while in that condition."  Perry, 610 So.Ct. 750 (citing cases dating back to 1897).

---

[18]     We also note that this claim was not included in his prior federal habeas petition either.

18

Moreover, Fearance cannot legitimately assert that the facts underlying his forced medication claims are novel as of the filing of his third state petition. His mental health issue was first developed in state habeas hearings during 1990. Even at that time, the prison medical records showed he had been medicated with Haldol throughout at least 1988 and 1989. Typical of these records is one dated November 18, 1988, which reports that he had repeated admissions to the psychiatric unit for treatment for psychotic relapses "secondary to medication non-compliance." He suffered from "periodic poor medication compliance." See Appendix to Third State Court Petition for Habeas Relief, Exhibit B, "Psychiatric Records from TDCJ," at 136; See also id., e.g., pp. 122, 124, 135, 140-141, 189-91, 200. There is no question that a claim for forcible medication could have arisen from these treatments before his first state hearing, and certainly prior to his second state petition in 1992.

                                III.

For the foregoing reasons, Fearance's petition for CPC and motion for stay of execution are DENIED.