Scott Louis PANETTI, Petitioner,

v.

Doug DRETKE, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. A–04–CA–042–SS.

United States District Court,
W.D. Texas,
Austin Division.

Sept. 29, 2004.

Michael Clark Gross, Law Office of Michael C. Gross, San Antonio, TX, Keith S.

Hampton, Attorney at Law, Austin, TX, for Petitioner.

Tina J. Dettmer, Office of the Attorney General, Austin, TX, for Respondent.

## *ORDER*

SPARKS, District Judge.

BE IT REMEMBERED on the 7th day of September 2004 the Court called the above-styled cause for an evidentiary hearing to determine Petitioner's competency to be executed. The parties appeared through counsel, which over the course of two days, presented evidence and oral arguments. Now before the Court is Petitioner's Petition for Writ of Habeas Corpus [# 1]. Having considered the evidence, the arguments of counsel, and the relevant law, the Court now enters the following opinion and orders.

### Background

Petitioner Scott Louis Panetti is currently confined on "death row," in the Polunsky Unit of the Texas Department of Criminal Justice ("TDCJ"). He has been sentenced to death for murdering Amanda and Joe Alvarado, the parents of his estranged wife, on September 8, 1992. He brought this, his second application[1] for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 26, 2004, after his execution date had been set and he had exhausted the available state court procedures, alleging he was incompetent to be executed. Panetti's attorney had filed a motion under Article 46.05 of the Texas Code of Criminal Procedure ("Article 46.05") in state court on December 9, 2003. On December 23, 2003, the state district judge, after considering the exhibits attached to the motion, denied Panetti's motion on the following grounds:

> [T]he Defendant has failed to set forth alleged facts in support of the assertion that the Defendant is presently incompetent to be executed and has failed to make a substantial showing that the defendant is thus incompetent. The court further finds that the Defendant has failed to raise a substantial doubt of the defendant's competency to be executed on the basis of the said motion and attached documents, as required by Article 46.05(d), Tex.Code Crim. Proc.

Panetti filed a motion for stay of execution in this Court in conjunction with his habeas application, arguing this finding is a decision contrary to clearly established Supreme Court precedent, and specifically, *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

The issue before this Court in deciding the initial motion to stay was whether reasonable jurists could disagree regarding whether the state court's decision that Panetti had not made a substantial showing of incompetency which would warrant evaluation of two mental health experts was an unreasonable application of *Ford* and its progeny. Initially, however, Panetti and his attorney failed to include with their motion to stay or federal habeas application the Article 46.05 motion filed in the state court or any evidence of Panetti's current mental status. After this Court denied the first motion, counsel for Panetti submitted a copy of the Article 46.05 application along with his first motion for reconsideration. This motion too was denied

---

1. Panetti filed his first federal habeas petition in 1999, wherein he alleged fourteen grounds for relief, including claims that he was incompetent to waive counsel and incompetent to stand trial, but not that he was incompetent to be executed. *See Panetti v. Johnson,* Cause No. A:99–CA–260–SS (W.D.Tex. Mar. 9, 2001). This Court's opinion was affirmed on appeal. *See Panetti v. Cockrell,* No. 01–50347, 73 Fed.Appx. 78, slip. op. at 6–8 (5th Cir. Jun. 19, 2003).

as Panetti and his attorney still failed to offer any evidence of Panetti's current mental status. Finally, along with a second motion for reconsideration, Panetti presented evidence to support his contention he was presently incompetent to be executed in the form of the report of a clinical and forensic psychologist, Dr. Mark Cunningham, and the affidavit of a law professor, David Dow, each of whom had observed Panetti and concluded that he suffers from delusions that cause him to misunderstand whether and why he will be executed.

Counsel for Panetti informed the Court that the same evidence had been presented to the state court in a renewed motion to determine his competency under Article 46.05. Therefore, the Court held it appropriate that Panetti present his new evidence to the state court first because at that point, the Court was limited by AEDPA to reviewing the reasonableness of the state court's denial of Panetti's Article 46.05 motion based on the evidence it had before it at the time the state court denied Panetti's initial motion in December 2003. However, because the execution was scheduled for the following day, February 5, 2004, the Court stayed the execution for 60 days to allow the state court a reasonable period of time to consider the evidence of Panetti's current mental state and decide whether he had "raised a substantial doubt of [his] competency to be executed" and made the requisite showing of incompetency that entitles him to a mental health evaluation by at least two mental health experts under Article 46.05. TEX. CODE. CRIM. P. Art. 46.05.

Subsequently on February 23, 2004, relying on Article 46.05(f), the state court entered an order appointing psychiatrist Mary Anderson and clinical psychologist George Parker to examine Panetti. By citing Article 46.05(f),[2] Judge Ables implicitly found Panetti had made "a substantial showing of incompetency" with the documentary evidence submitted. On April 28, 2004, the appointed experts filed their joint report concluding Panetti was competent to be executed. Counsel for Panetti was then ordered to raise any other matters regarding competency by May 21, 2004. On that date, Panetti filed objections to the methods and conclusions of the experts and renewed his motions to appoint counsel, hire a mental health expert, and hire an investigator. He also asked the trial court to hold an evidentiary hearing, which this Court has since held was required under the Supreme Court's decision in *Ford.* However, rather than hold the required evidentiary hearing, on May 26, 2004, Judge Ables entered an order concluding, "[b]ased on the aforesaid doctors' reports, the Court finds the Defendant has failed to show, by a preponderance of the evidence, that he is incompetent to be executed." *Id.*

This Court held, in its July 20, 2004 Order, that the state court's failure to hold a final competency hearing in which Panetti could present his own evidence constituted non-compliance with Article 46.05. Because the state court did not comply with the statute, the Court concluded its findings were not within the safe harbor created by the Fifth Circuit in *Caldwell v. Johnson,* which insulates state proceedings

---

**2.** TEX CODE. CRIM P. Art. 46.05(f) states: "If the trial court determines that the defendant has made a substantial showing of incompetency, the court shall order at least two mental health experts to examine the defendant using the standard described by Subsection (h) to determine whether the defendant is incompetent to be executed." Judge Ables's appointment of experts pursuant to this provision can be contrasted with his disposition of Panetti's initial motion to determine competency, which he denied "on the basis of the said motion and attached documents, as required by Article 46.05(d)."

conducted in compliance with Article 46.05 from habeas attacks on the grounds they fall short of what *Ford* requires. 226 F.3d 367, 374 (5th Cir.2000). This Court further held, since the state court had determined counsel for Panetti had made "a substantial showing of incompetency," its failure to "receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination," was a violation of due process under *Ford.* 477 U.S. at 427, 106 S.Ct. 2595.

On that basis, the Court set an evidentiary hearing to determine Panetti's competency to be executed, pursuant to *Ford.* The Court appointed counsel and authorized funds so that Panetti could obtain investigative and expert assistance.

## I. Standard of Review and Burden of Proof

█ Ordinarily, the factual findings of a state habeas court are entitled to great deference. For instance, pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a petitioner seeks habeas relief in federal court, "[a] state court's findings of fact are presumed to be correct unless the petitioner rebuts the presumption by 'clear and convincing evidence.'" *Patterson v. Dretke,* 370 F.3d 480, 484 (5th Cir.2004), 28 U.S.C. § 2254(e)(1). The Fifth Circuit has expressly held a "state court's determination that a prisoner is competent to be executed is a factual[ ] finding entitled to the presumption of correctness under Section 2254(e)(1)." *Patterson,* 370 F.3d at 484; *Barnard v. Collins,* 13 F.3d 871, 874 (5th Cir.1994). Additionally, no habeas relief may be granted unless the petitioner can show the state court's adjudication of the claim resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Brown v. Cain,* 104 F.3d 744, 749 (5th Cir.1997), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997).

Respondent contends the Court should apply the deferential standards of review codified by the AEDPA in resolving the question of Panetti's competency to be executed. To apply such deference, however, would fly in the face of the Supreme Court's holding in *Ford.* There, seven Justices of the Supreme Court concluded denying a petitioner the right to present, as well as rebut, evidence in making a competency-to-be-executed determination violates the right to due process. See *Ford,* 477 U.S. at 414–15, 106 S.Ct. 2595 (Marshall, J.) ("[A]ny procedure that precludes the prisoner or his counsel from presenting material relevant to his sanity or bars consideration of that material by the factfinder is necessarily inadequate.... A related flaw ... is the denial of any opportunity to challenge or impeach the state-appointed psychiatrists' opinions."); *Id.* at 423, 106 S.Ct. 2595 (Powell, J., concurring) ("As Justice O'CONNOR states, '[i]f there is one "fundamental requisite" of due process, it is that an individual is entitled to an 'opportunity to be heard.' ' "). Justice Powell specifically noted state proceedings deficient in this respect "invite[ ] arbitrariness and error," and on that basis, he concluded no presumption of correctness should attach to the state court findings.

█ The Court in *Ford* was faced with a prior version of § 2254, however, in which the statutory presumption of correctness was expressly made inapplicable in cases in which "the factfinding procedure employed by the State court was not ade-

quate to afford a full and fair hearing." *See* 28 U.S.C. § 2254(d), subsequently amended by Antiterrorism and Effect Death Penalty Act (AEDPA) of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996); *Ford*, 477 U.S. at 423, 106 S.Ct. 2595. Despite the fact that the current version of the *statute* omits this particular express limitation on the presumption, Justice Powell's holding is still relevant. After all, Justice Powell based his conclusion that no presumption of correctness should attach to the state court's determination, not only on the statute, but also because "[the statutory] standard is no different from the protection afforded by procedural due process." *Id.* at 424, 106 S.Ct. 2595. Because the Court's holding in *Ford* was grounded in part in the Constitution, subsequent changes to the habeas statute should not alter its determination that no deference may be afforded to state court competency-to-be executed proceedings resulting in a denial to the petitioner of an effective right to participate. One of the primary justifications for the Court's due process holding in *Ford* was the likelihood such proceedings would produce erroneous factual findings. It would be absurd then to presume the correctness of findings that are constitutionally suspect precisely because they are likely to be incorrect. Deference to constitutionally inadequate state court proceedings would only serve to taint this Court's evidentiary proceedings.

Nonetheless, Respondent contends deference is required, relying on *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir.2001) for its holding that "a full and fair hearing is not a prerequisite to the operation of AEDPA's deferential scheme." *Id.* at 946. Such reliance is misplaced. Although the court in *Valdez* was unwilling to conclude "a full and fair hearing" is a prerequisite to AEDPA deference *generally*, there is no reason to believe that the Fifth Circuit intended to hold the AEDPA somehow overruled the Supreme Court's constitutional holding in *Ford*. This Court concludes that *Ford*, as a matter of due process, demands a de novo review of the petitioner's competency to be executed.

Finally, as to the burden of proof, the Court assumes, without expressly holding, the petitioner must demonstrate, by a preponderance of the evidence, he is incompetent to be executed. In light of the parties agreement at oral argument that a simple preponderance is the relevant standard of proof, as well as the fact that the Court's ultimate findings would remain unchanged if any higher burden were applied, the Court need not formally reach the issue.

## II. The Evidentiary Hearing

 This Court, two juries, and various appellate courts have found Panetti to be competent during various stages of the criminal proceedings against him and during his prior efforts to obtain habeas relief. Those determinations, however, did not involve the question of Panettis' competency *to be executed*, nor did they then purport to resolve any doubts that might subsequently arise about his present competency. Nonetheless, those determinations are clearly relevant to the question of his present competency to be executed. As the Supreme Court made clear in *Ford*, such prior findings may serve as the basis of a presumption of a petitioner's competency under state law. In this case, however, since the state court concluded counsel for Panetti made "a substantial showing of incompetency" to overcome the presumption created by the prior adjudications of his mental state, this Court concludes the evidence adduced at the evidentiary hearing in this proceeding should be of primary significance in this case.

This Court called an evidentiary hearing on September 7, 2004, and it lasted two

days. Counsel for Petitioner presented the testimony of four expert witnesses: Dr. Mary Alice Conroy, a clinical and forensic psychologist; Dr. Susana Rosin, a clinical psychologist; Dr. Seth Silverman, a psychiatrist; and the aforementioned Dr. Cunningham. The State presented two expert witnesses, Dr. Parker and Dr. Anderson, appointed to evaluate Panetti by the state habeas court, and three fact witnesses, Major Steven Miller, Lieutenant Terri Hill, and Victoria Williams, TDCJ corrections officers who have had the opportunity to observe Panetti at his place of incarceration, to varying degrees, in recent months and years. All of the expert witnesses based their testimony on their respective meetings with Panetti, interviews with people that know him, and Panetti's medical and custodial records.

The expert witnesses, on both sides, seemed to agree Panetti suffers from some form of mental illness. They disagreed, however, about the extent (and diagnosis) of his illness as well as the extent his illness interferes with his ability to understand the reason for his impending execution. Certain facts may be regarded as established, however. First, the testimony of the witnesses, in sum, supports a finding that Mr. Panetti suffers from some form of mental illness, which some have diagnosed as a schizoaffective disorder. His illness is significantly characterized, first, by tangentiality and loose association, which means his cognitive processes are impaired in such a way that, when he speaks, he often jumps from topic to topic for no apparent reason, and second, by grandiosity and a delusional belief system in which he believes himself to be persecuted for his religious activities and beliefs. Although Dr. Parker and Dr. Anderson concluded that some portion of Panetti's behavior could be attributed to malingering, their testimony merely casts doubt on the extent of Panetti's mental illness and symptoms, as they too concluded that his illness was at least, to some degree, genuine.

Each of the expert witnesses weighed in on his or her view of Panetti's understanding of the fact he is to be executed and the reason for it. All agreed Panetti understands he is going to be executed and, at least implicitly, they agreed he is capable of understanding that fact. Despite their converging points of view on this basic point, their opinions diverged on a number of other points.

There was disagreement among Panetti's own witnesses about whether Panetti has an understanding of the murders he committed. Dr. Conroy stated Panetti would say almost nothing about the subject, and what he did say came across as rather garbled. Nonetheless, she was able to testify, "he seemed to be saying that God had nullified it, God had forgiven him, God had wiped the slate clean-in fact he uses the phrase wiped the slate clean-and it would be sinful to talk about that because its no longer an issue." Dr. Rosin testified somewhat more clearly Panetti knows he killed his wife's parents, basing her conclusion on details of the murders that he went over with her during their meeting. Dr. Silverman testified, on the other hand, that Panetti told him he believed another individual named Sarge committed the murders of his in-laws, and Panetti took no responsibility for them. Dr. Silverman also indicated he did not find it unusual for three different people asking the same question to get three different answers from someone with Panetti's condition.

The witnesses further disagreed about whether Panetti understands the reason he is being executed. Significantly, no witness was able to state as a matter of fact that Panetti understands he is being executed for the murders he committed.

Dr. Parker and Dr. Anderson both testified Panetti has the capacity to understand this fact but were unable to reach a formal conclusion that he did, in fact, understand it. Their inability to reach this formal conclusion apparently can be largely attributed to the fact Panetti did not tell them he understood he was to be executed for committing the murders during their interview with him.[3] Dr. Parker and Dr. Anderson based their view that Panetti is capable of understanding the reason for his execution on their determinations about his cognitive functionality generally. For example, Dr. Parker testified that in letters Panetti writes to friends and family, he often communicates lucid, socially appropriate thoughts. Dr. Anderson testified that although many of Panetti's responses to her questions in their meeting were abstract and indirect, she regarded them as logical. She further stated Panetti's "capacity to understand the Bible, to understand history, movies, other things that he referenced, tells me he has the capacity to understand the facts of why he's being executed." The observations of Major Miller, Lieutenant Hill, and Ms. Williams corroborate Dr. Parker's and Dr. Anderson's view that at least some of the time, Panetti is capable of communicating, and apparently understanding, in a coherent fashion.

The witnesses for Panetti did not dispute he has the cognitive functionality to communicate coherently much of the time.

Their testimony about his condition was that, despite the fact he can think and communicate coherently about certain subjects and in certain environments, he suffers from delusions about the world around him. Significantly, they testified he suffers from the delusion that the real reason for his execution is his preaching the Gospel. Dr. Conroy testified Panetti believes his execution is part of a "spiritual warfare" which has been going on since the 1980s.

Dr. Conroy and Dr. Rosin both testified, despite his delusions, Panetti understands the State's stated reason for seeking his execution is for his murders. They based this testimony on what Panetti told them in their meetings with him. Ultimately, both concluded, however, Panetti does not appreciate the connection between his crimes and his execution. They apparently reached this conclusion from the premise that, as a result of his delusions of persecution, he disbelieves the State's stated reason for executing him. Dr. Silverman testified that in his view, Panetti does not associate his execution with the murders he committed in any way. This view was informed, however, at least in part, by the fact that Panetti did not specifically tell Dr. Silverman he understands the State's stated reason for seeking his execution.

Dr. Cunningham testified, although Panetti understands that the State of Texas is

---

**3.** Dr. Parker and Dr. Anderson regarded Panetti's failure to confess this understanding as deliberate manipulation and uncooperativeness. However, based on the testimony of the other witnesses who have interviewed him as well as TDCJ records, there is little evidence to suggest that Panetti behaved any differently with Dr. Parker and Dr. Anderson than he has with any other mental health professional who has interacted with him. Specifically, each witness testified Panetti told them he believes that he is to be executed for preach-

ing the Gospel. Dr. Parker and Dr. Anderson treated this answer as nonresponsive while the others were willing to regard it as a product of a genuine delusion on Panetti's part. The consistency of Panetti's behavior does not necessarily serve to disprove Dr. Parkers's and Dr. Anderson's contention that Panetti's behavior can be partially attributed to malingering, but it at least rebuts Respondent's insinuation that Panetti only refused to talk with *his* experts.

going to execute him, his delusions prevent him from recognizing the State as "a lawfully constituted authority." Rather, according to Dr. Cunningham, Panetti sees the State "as being in league with the forces of evil to prevent him from preaching the Gospel."

### III. *Competency to be Executed*

The Fifth Circuit has set forth the standard for competency to be executed as follows: "[A]ll we require is 'that a person know the fact of his impending execution and the reason for it.'" *Fearance v. Scott,* 56 F.3d 633, 640 (5th Cir.1995) (citing *Barnard,* 13 F.3d at 876 n. 2). Counsel for Panetti do not dispute Panetti knows the fact of his impending execution. Their contention is Panetti's incompetency is grounded in his failure to understand the reason for his execution. As to that portion of the incompetency test, the facts of this case arguably require a more nuanced standard than what has developed by any federal appellate court to date. There is evidence in the record to support a finding that Panetti is *capable* of understanding the reason for his execution, as well as evidence to support a finding that, in fact, he does understand (at least at some level) *the state's stated reason* for his execution. Nonetheless, the record also would support a finding, not necessarily inconsistent with the first two, that in another possibly relevant sense, Panetti does not, in fact, know or understand the reason for his execution.

The Fifth Circuit cases dealing with competency to be executed are less than clear about *how* a district court is to apply the standard in a factually complex case such as this one. First, although the Fifth Circuit in both *Fearance* and *Barnard* at some point stated the appropriate question is simply whether a petitioner *knows* the fact of and reason for his execution, at other points, the court has also suggested the inquiry might involve a more substantial determination than what the petitioner factually knows. For example, the court has at least purported to adopt the standard enunciated by Justice Powell's concurring opinion in *Ford,* which sets out the required mental state of a person to be executed in somewhat more detail:

> If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied, and only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

*See Garrett v. Collins,* 951 F.2d 57, 59 (5th Cir.1992) and *Lowenfield v. Butler,* 843 F.2d 183, 187 (5th Cir.1988) (both quoting and relying on this excerpt from Justice Powell's concurrence in *Ford,* 477 U.S. at 422, 106 S.Ct. 2595 (Powell, J., concurring), in denying competency-to-be-executed habeas relief); *see also Fearance,* 56 F.3d at 640 and *Barnard,* 13 F.3d at 876 n. 2 (holding that the Fifth Circuit has adopted the Powell concurrence as the standard for competency to be executed).

Counsel for Panetti suggests this Court should treat Justice Powell's concurrence in *Ford* as controlling law. However, despite the fact the Fifth Circuit has purported to adopt Justice Powell's concurrence, it is clear from the court's holdings it has adopted his standard only in a limited sense, and furthermore, it has not adopted his reasoning at all. Justice Powell's proposed standard that only those who are "unaware of the punishment they are about to suffer and why they are to suffer it" are incompetent to be executed, standing alone, is somewhat ambiguous.

On the one hand, as discussed further below, the Fifth Circuit has, without any discussion of the potential broader import of the statement, apparently ·interpreted Justice Powell's use of the concept of "awareness why" to require no more than knowledge of the required factual predicate for an execution. On the other hand, at least one federal district court has pointed out that Justice Powell's use of the term "why," outside the context of his argument and if interpreted broadly, could be stretched to require even that a defendant receives a metaphysical explanation for his punishment.[4] Justice Powell's reasoning, which gives context to his proposed holding, however, makes clear that, at least for him, the requirement that defendants have an awareness of why they are to suffer execution derives directly from the proposition that " 'the retributive goal of the criminal law is satisfied' when the defendant 'perceives the connection between his crime and his punishment.' " In this sense, counsel for Panetti are correct to suggest the Powell concurrence requires more than a bare factual knowledge of the reason for execution-rather, it requires that petitioner's understanding of the reason for his punishment is sufficiently clear that the retributive goal of the law may be satisfied. Ultimately, however, Petitioner's problem is that the Powell concurrence is not, in fact, controlling law.

As a number of courts have pointed out, Justice Powell's concurrence in *Ford* was decisive in that, in conjunction with Justice Marshall's plurality opinion, it gave rise to a majority holding in the case. However, the opinions of the plurality and Justice Powell converged only with respect to two holdings: (1) that the Eighth Amendment prohibits execution of the insane and (2) that the state procedures for determining competency at issue in the case did not meet the requirements of due process. *Ford,* 477 U.S. at 418, 424, 106 S.Ct. 2595. The plurality represented by Justice Marshall specifically declined to reach a holding on the question of what standard should be used to determine incompetency for the purposes of the Eighth Amendment prohibition. *See id.* at 418, 106 S.Ct. 2595 (Powell, J., concurring) ("The Court's opinion does not address [the meaning of insanity in the context of the Eight Amendment prohibition]"). Thus, the Powell concurrence does not operate as binding Supreme Court precedent on what standard governs competency to be executed.

Furthermore, although the Fifth Circuit has purported to adopt the Powell concurrence without any apparent express limitation, its holdings suggest it has not adopted Justice Powell's "retributive goal" requirement. This Court can find no instance in which the Fifth Circuit has suggested, other than its quotation of the language of the Powell concurrence, that the competency inquiry includes a determination of whether the petitioner's knowledge or understanding of the reason for his execution is sufficient to permit the court to conclude that the retributive goal of the criminal law may be satisfied. Had the court applied this "retributive goal" standard, at least some of its cases may

---

4. The Court there wrote:

> The defendant cannot be entitled to such an explanation. Metaphysics is not sufficiently advanced to provide a satisfactory rationale. Moreover, a fundamental notion of justice prevents the defendant from receiving this reasoning. An ordinary person, who never possessed the tenacity to kill another human, may contact a fatal disease. This person will never understand why he is to die. . . . If the innocent person cannot receive this explanation, why should an individual who made a conscious decision to end another human's life?

*Martin v. Dugger,* 686 F.Supp. 1523, 1571 & n. 21 (S.D.Fla.1988).

have come out differently. In *Fearance,* for instance, the court held the following facts, standing alone, were sufficient to establish competency to be executed: "Petitioner testified that he knew the date scheduled for his execution, the date of the offense for which he was on death row, that he was sentenced to die for murdering Larry Faircloth, and that the murder was alleged to have occurred during the course of a burglary." *Fearance,* 56 F.3d at 640. The court made clear no further inquiry into the petitioner's knowledge or understanding of his execution or the reason for it was required. *Id.*

The Fifth Circuit in *Barnard* was forced to deal with the competency of a petitioner who, like Panetti, suffered from delusions of persecution. There, the state habeas court had found the petitioner in the case's "perception of the reason for his conviction and impending execution is at times distorted by a delusional system in which he attributes anything negative that happens to him to a conspiracy of Asians, Jews, Blacks, homosexuals and the Mafia." *Barnard,* 13 F.3d at 876. Despite the fact the petitioner's understanding of the reason for his execution was impaired by delusions, the Fifth Circuit concluded his knowledge of the relevant factual predicate, that "his pending execution was because he had been found guilty of that crime," was sufficient to support the state court's legal conclusion he was competent to be executed. *Id.* Although the court stated it was following the Powell concurrence in reaching its conclusion that the standard for competency had been satisfied, it did not even suggest the presence of an issue with respect to its "retributive goal" aspect. *Id.* Had the court determined the "retributive goal" inquiry was required, the result it reached may have been different. At the very least, the state court's findings with respect to the petitioner's delusions would have given rise to an arguable issue about whether his understanding of the reason for his execution was so distorted that the retributive goal of the law would not be satisfied by his execution.

■■■ Ultimately, the Fifth Circuit test for competency to be executed requires the petitioner know no more than the fact of his impending execution and the factual predicate for the execution. Turning now to the case before it, the Court finds the following facts to be established:

First, Panetti is aware he is to be executed. This fact is undisputed, and each of the expert witnesses agreed he is aware of his impending execution.

Second, although there was some disagreement on this point, Panetti is aware he committed the murders that serve as the basis for his execution. Dr. Conroy and Dr. Rosin both testified Panetti knows he murdered his in-laws. However, Dr. Silverman expressed doubt about this. The Court notes Dr. Silverman seemed to base his doubts, in large part, on the fact Panetti did not demonstrate his awareness by stating he committed the murders during the course of their interview. The fact Panetti did not make such a statement in the course of a single interview is insufficient to demonstrate by a preponderance of the evidence he is unaware of the crimes he committed.

Finally, Panetti understands the State's stated reason for executing him is that he committed two murders. Again, both Dr. Conroy and Dr. Rosin offered testimony Panetti was aware of this fact. Dr. Silverman, though, disagreed on this point too. However, his conclusion Panetti does not understand the State's stated reason for his execution is inextricably intertwined with his determination Panetti is not even aware he committed the murders for which he is to be executed. Since the Court

disagrees with the predicate of Dr. Silverman's determination on this question, it accords his ultimate conclusion little weight.

Dr. Cunningham's testimony, on the other hand, raises a somewhat more difficult issue on this point. He suggests Panetti does not even understand that the State of Texas is a lawfully constituted authority, but rather, he believes the State is in league with the forces of evil that have conspired against him. His testimony is consistent with that of Dr. Conroy, Dr. Rosin, and Dr. Silverman, each of whom testified Panetti believes the real reason he is to be executed is for preaching the Gospel. However, as discussed above, under the precedent of the Fifth Circuit, a petitioner's delusional beliefs-even those which may result in a fundamental failure to appreciate the connection between the petitioner's crime and his execution-do not bear on the question of whether the petitioner "knows the reason for his execution" for the purposes of the Eighth Amendment.

Because the Court finds that Panetti knows he committed two murders, he knows he is to be executed, and he knows the reason the State has given for his execution is his commission of those murders, he is competent to be executed.

In accordance with the foregoing:

IT IS ORDERED Panetti's Petition for Writ of Habeas Corpus [# 1] is DENIED.

IT IS FURTHER ORDERED the execution of Scott Louis Panetti shall be stayed pending the outcome of the appeal in this case.