Justice Thomas,
with whom The Chief Justice, Justice Scalia, and Justice Alito join, dissenting.
Scott Panetti’s mental problems date from at least 1981. While Panetti’s mental illness may make him a sympathetic figure, state and federal courts have repeatedly held that he is competent to face the consequences of the two murders he committed. In a competency hearing prior to his trial in 1995, a jury determined that Panetti was competent to stand trial. A judge then determined that Panetti was competent to represent himself. At his trial, the jury rejected Panetti’s insanity defense, which was supported by the testimony of two psychiatrists. Since the trial, both state and federal *963 habeas courts have rejected Panetti’s claims that he was incompetent to stand trial and incompetent to waive his right to counsel.
This case should be simple. Panetti brings a claim under Ford v. Wainwright, 477 U. S. 399 (1986), that he is incompetent to be executed. Presented for the first time in Panetti’s second federal habeas application, this claim undisputedly does not meet the statutory requirements for filing a “second or successive” habeas application. As such, Panetti’s habeas application must be dismissed. Ignoring this clear statutory mandate, the Court bends over backwards to allow Panetti to bring his Ford claim despite no evidence that his condition has worsened — or even changed — since 1995. Along the way, the Court improperly refuses to defer to the state court’s finding of competency even though Panetti had the opportunity to submit evidence and to respond to the court-appointed experts’ report. Moreover, without undertaking even a cursory Eighth Amendment analysis, the Court imposes a new standard for determining incompetency. I respectfully dissent.
I
The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires applicants to receive permission from the court of appeals prior to filing second or successive federal habeas applications. 28 U. S. C. § 2244(b)(3). Even if permission is sought, AEDPA requires courts to decline such requests in all but two narrow circumstances. § 2244(b)(3)(C); § 2244(b)(2).[1] Panetti raised his Ford claim *964 for the first time in his second federal habeas application, ante, at 938, 942, but he admits that he did not seek authorization from the Court of Appeals and that his claim does not satisfy either of the statutory exceptions. Accordingly, § 2244(b) requires dismissal of Panetti’s “second . . . habeas corpus application.”
The Court reaches a contrary conclusion by reasoning that AEDPA’s phrase “second or successive” “takes its full meaning from our case law, including decisions predating the enactment of [AEDPA].” Ante, at 943-944 (citing Slack v. McDaniel, 529 U. S. 473, 486 (2000)). But the Court fails to identify any pre-AEDPA case that defines, explains, or modifies the phrase “second or successive.” Nor does the Court identify any pre-AEDPA case in which a subsequent habeas application challenging the same state-court judgment was considered anything but “second or successive.”[2] 2 To my knowledge, there are no such cases.
Before-AEDPA’s enactment, the phrase “second or successive” meant the same thing it does today — any subsequent federal habeas application challenging a state-court judgment that had been previously challenged in a federal habeas application. See, e. g., Kuhlmann v. Wilson, 477 U. S. 436, *965 451-452 (1986) (plurality opinion); Barefoot v. Estelle, 463 U. S. 880, 895 (1983). Prior to AEDPA, however, second or successive habeas applications were not always dismissed. Rather, the pre-AEDPA abuse of the writ doctrine allowed courts to entertain second or successive applications in certain circumstances. See 28 U. S. C. § 2254(b) Rule 9(b) (1994 ed.) (“A second or successive petition may be dismissed [when] new and different grounds are alleged [if] the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ”); McCleskey v. Zant, 499 U. S. 467, 470 (1991); Kuhlmann, supra, at 451-452 (plurality opinion); Barefoot, supra, at 895. Consistent with this practice, prior to AEDPA, federal eourts treated Ford claims raised in subsequent habeas applications as “second or successive” but usually allowed such claims to proceed under the abuse of the writ doctrine.[3] See Martin v. Dugger, 686 F. Supp. 1523, 1528 (SD Fla. 1988) (permitting a Ford claim raised in a “second” habeas petition “[b]ecause Ford was a substantial change in constitutional law [and the prisoner] was unaware of the legal significance of relevant facts”); Barnard v. Collins, 13 F. 3d 871, 875, 878 (CA5 1994); Shaw v. Delo, 762 F. Supp. 853, 857-859 (ED Mo. 1991); Johnson v. Cabana, 661 F. Supp. 356, 364 (SD Miss. 1987). Still, *966 though, at least one court found a Ford claim raised in a subsequent application to be an abuse of the writ. Rector v. Lockhart, 783 F. Supp. 398, 402-404 (ED Ark. 1992).
When it enacted AEDPA, Congress “further restrict[ed] the availability of relief to habeas petitioners” and placed new “limits on successive petitions.” Felker v. Turpin, 518 U. S. 651, 664 (1996). Instead of the judicial discretion that governed second or successive habeas applications prior to AEDPA, Congress required dismissal of all second and successive applications except in two specified circumstances. § 2244(b)(2). AEDPA thus eliminated much of the discretion that previously saved second or successive habeas petitions from dismissal.
Stating that we “ha[ve] declined to interpret ‘second or successive’ as referring to all § 2254 applications filed second or successively in time,” ante, at 944, the Court relies upon Stewart v. Martinez-Villareal, 523 U. S. 637, 640, 645-646 (1998), in which we held that a subsequent application raising a Ford claim could go forward. In that case, however, the applicant had raised a Ford claim in his initial habeas application, and the District Court had dismissed it as unripe. 523 U. S., at 640. Refusing to treat the applicant’s subsequent application as second or successive, the Court simply held that the second application renewed the Ford claim originally presented in the prior application:
“This may have been the second time that respondent had asked the federal courts to provide relief on his Ford claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to § 2244(b). There was only one application for habeas relief, and the District Court ruled (or should have ruled) on each claim at the time it became ripe. Respondent was entitled to an adjudication of all of the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief.” 523 U. S., at 643.
*967 In other words, Martinez-Villareal held that where an applicant raises a Ford claim in an initial habeas application, § 2244 does not bar a second application once the claim ripens because the second application is a continuation of the first application. 523 U. S., at 643-645; cf. Burton v. Stewart, 549 U. S. 147, 155 (2007) (per curiam) (“[U]nlike Burton, the prisoner [in Martinez-Villareal] had attempted to bring this claim in his initial habeas petition”). Martinez-Villareal does not apply here because Panetti did not bring his Ford claim in his initial habeas application.[4]
The Court does not and cannot argue that any time a claim would not be ripe in the first habeas petition, it may be raised in a later habeas petition. We unanimously rejected such an argument in Burton v. Stewart, supra. In Burton, the petitioner filed a federal habeas petition challenging his convictions but not challenging his sentence, which was at that time still on review in the state courts. After the state courts rejected his sentencing claims, the petitioner filed a second federal habeas petition, this time challenging his sentence. The Ninth Circuit held that Burton’s second petition was not “second or successive” under AEDPA, “reasoning] that because Burton had not exhausted his sentencing claims in state court when he filed the [first] petition, they were not ripe for federal habeas review at that time.” Id., at 153 (internal quotation marks omitted). The Ninth Circuit found that the second petition was not foreclosed by AEDPA since the claim would not have been ripe if raised in the first *968 petition. Ibid. We rejected the Ninth Circuit’s view and held that AEDPA barred Burton’s second petition. In light of Burton, it simply cannot be maintained that Panetti is excused from §2244’s requirements solely because his Ford claim would have been unripe had he included it in his first habeas application. Today’s decision thus stands only for the proposition that Ford claims somehow deserve a special (and unjustified) exemption from the statute’s plain import.
Because neither AEDPA’s text, pre-AEDPA precedent, nor our AEDPA jurisprudence supports the Court’s understanding of “second or successive,” the Court falls back on judicial economy considerations. The Court suggests that my interpretation of the statute would create an incentive for every prisoner, regardless of his mental state, to raise and preserve a Ford claim in the event the prisoner later becomes insane. Ante, at 943, 946-947. Even if this comes to pass, it would not be the catastrophe the Court suggests. District courts could simply dismiss unripe Ford claims outright, and habeas applicants could then raise them in subsequent petitions under the safe harbor established by Martinez-Villareal. Requiring that Ford claims be included in an initial habeas application would have the added benefit of putting a State on notice that a prisoner intends to challenge his or her competency to be executed. In any event, regardless of whether the Court’s concern is justified, judicial economy considerations cannot override AEDPA’s plain meaning. Remaining faithful to AEDPA’s mandate, I would dismiss Panetti’s application as second or successive.
II
The Court also errs in holding that the state court unreasonably applied “clearly established” Supreme Court precedent by failing to afford Panetti adequate procedural protections. Ante, at 948. Panetti is entitled to habeas relief only if the state-court proceedings “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Su *969 preme Court of the United States.” 28 U. S. C. § 2254(d)(1). Even if Justice Powell’s concurrence in Ford qualifies as clearly established federal law on this point, the state court did not unreasonably apply Ford.[5]
A
The procedural rights described in Ford are triggered only upon “a substantial threshold showing of insanity.” 477 U. S., at 426 (Powell, J., concurring in part and concurring in judgment); id., at 417 (plurality opinion) (using the term “high threshold”). Following an “independent review of the record,” ante, at 950, the majority finds that Panetti has made a satisfactory threshold showing. That conclusion is insupportable.
Panetti filed only two exhibits with his Renewed Motion to Determine Competency in the state court. See Scott Panetti’s Renewed Motion to Determine Competency to Be Executed in Cause No. 3310 (Gillespie Cty., Tex., 216th Jud. Dist., Feb. 4, 2004) (hereinafter Renewed Motion).[6] The *970 first was a one-page letter from Dr. Cunningham to Panetti’s counsel describing his 85-minute “preliminary evaluation” of Panetti. Letter from Mark D. Cunningham, Ph.D., to Michael C. Gross (Feb. 8,2004), 1 App. 108. Far from containing “pointed observations,” ante, at 950, Dr. Cunningham’s letter is unsworn, contains no diagnosis, and does not discuss whether Panetti understood why he was being executed, ante, at 961. Panetti’s other exhibit was a one-page declaration of a law professor who attended Cunningham’s 85-minute meeting with Panetti. Declaration of David R. Dow (Feb. 3, 2004), 1 App. 110. Professor Dow obviously made no medical diagnosis and simply discussed his lay perception of Panetti’s mental condition in a cursory manner. Ibid. The Court describes Dow as an “expert,” ante, at 950, but law professors are obviously not experts when it comes to medical or psychological diagnoses.
Panetti’s Renewed Motion attached no medical reports or records, no sworn testimony from any medical professional, and no diagnosis of any medical condition. The Court claims that Panetti referred “to the extensive evidence of mental dysfunction considered in earlier legal proceedings.” Ibid. But as the Federal District Court noted, Panetti merely “outlined his mental health history for the time period from 1981 until 1997.” Order of Jan. 30, at 4. This evidence— previously rejected by the state and federal courts that adjudicated Panetti’s other incompetency claims — had no relevance to Panetti’s competency to be executed in 2004 when he filed his Renewed Motion. Ibid. In addition to the utter lack of new medical evidence, no layperson who had observed Panetti on a day-to-day basis, such as prison guards or fellow inmates, submitted an affidavit or even a letter. In short, Panetti supported his alleged incompetency with only the preliminary observations of a psychologist and a lawyer, whose only contact with Panetti was a single 85-minute *971 meeting. It is absurd to suggest that this quantum of evidence clears the “high threshold,” entitling claimants to the procedural protections described by the plurality and Justice Powell in Ford. 477 U. S., at 417 (plurality opinion); see also id., at 426 (opinion of Powell, J.).[7]
B
Having determined that Panetti’s evidence exceeded the high threshold set forth in Ford, the Court asserts that Ford requires that “a court allow a prisoner’s counsel the opportunity to make an adequate response to evidence solicited by the state court.” Ante, at 952 (citing Ford, supra, at 427 (opinion of Powell, J.)). Justice Powell’s concurrence states that a prisoner has the right to present his or her evidence to an impartial decisionmaker. In light of the facts before the Court in Ford, it becomes obvious that in this ease Texas more than satisfied any obligations Justice Powell described.
1
Under the Florida law at issue in Ford, the Governor— not a court — made the final decision as to the condemned prisoner’s sanity. 477 U. S., at 412 (plurality opinion). The prisoner could not submit any evidence and had no opportunity to be heard. Id., at 412-413; id., at 424 (opinion of Powell, J.). In other words, the Florida procedures required *972 neither a neutral decisionmaker nor an opportunity for the prisoner to present evidence. Id., at 412-413; id., at 424.
Against this backdrop, Justice Powell’s concurrence states that due process requires an impartial decisionmaker and a chance to present evidence:
“The State should provide an impartial officer or board that can receive evidence and argument from the prisoner’s counsel, including expert psychiatric evidence that may differ from the State’s own psychiatric examination.” Id., at 427.
In setting forth these minimal procedural protections, Justice Powell explained that “[b]eyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake.” Ibid. Justice Powell stressed that “ordinary adversarial procedures ... are not necessarily the best means of arriving at sound, consistent judgments as to a defendant’s sanity.” Id., at 426.
2
Because a court considered Panetti’s insanity claim, the State clearly satisfied Justice Powell’s requirement to “provide an impartial officer or board.” Id., at 427. The sole remaining question, then, is whether the state court “receivefd] evidence and argument from the prisoner’s counsel, including expert psychiatric evidence that may differ from the State’s own psychiatric examination.” Ibid.
At the outset of its discussion, the Court suggests that Texas is not entitled to “substantial leeway” in determining what procedures are appropriate, see ibid., because Texas may have “violated] the procedural framework Texas has mandated for the adjudication of incompetency claims,” ante, at 950. As its sole support for that assertion, the Court states that there is “a strong argument the court violated state law by failing to provide a competency hearing.” Ibid. But Article 46.05 of the Texas Code of Criminal Pro *973 cedure provides no right to a competency hearing: “The determination of whether to appoint experts and conduct a hearing [under Article 46.05] is within the discretion of the trial court.” Ex parte Caldwell, 58 S. W. Sd 127, 130 (Tex. Crim. App. 2000). Contrary to. the Court’s statement, ante, at 952, this discretion does not depend on whether a substantial showing of incompetency has been made. See Caldwell, supra, at 130. Accordingly, there is no basis for denying Texas the “substantial leeway” Ford grants to States.
Texas' law allows prisoners to submit “affidavits, records, or other evidence supporting the defendant’s allegations” “that the defendant is presently incompetent to be executed.” Tex. Code Crim. Proc. Ann., Art. 46.05 (Vernon Supp. Pamphlet 2006). Therefore, state law provided Panetti with the legal right to submit whatever evidence he wanted. Here, it is clear that the state court stood ready and willing to consider any evidence Panetti wished to submit. The record of the state proceedings shows that Panetti took full advantage of this opportunity. For example, after the court-appointed experts presented their report, the state court gave Panetti a chance to respond, 1 App. 78, and Panetti filed a 17-page brief objecting to the report and arguing that there were problems in its methodology.[8] Objections to Experts’ Report, id., at 79. No extensive consideration of Panetti’s submitted evidence was necessary because the *974 submissions — the single-page statements of one doctor and one lawyer — were paltry and unpersuasive. That the evidence presented did not warrant more extensive examination does not change the fact that Panetti had an unlimited opportunity to submit evidence to the state court.
Based on Panetti’s evidence, the report by the court-appointed experts, and Panetti’s objections to that report, the state court found that “[defendant has failed to show, by a preponderance of the evidence, that he is incompetent to be executed.” Id., at 99. Given Panetti’s meager evidentiary submissions, it is unsurprising that the state court declined to proceed further. The Court asserts that “the order issued by the state court implied that its determination of petitioner’s competency [improperly] was made solely on the basis of the examinations performed by the psychiatrists it had appointed.” Ante, at 951. However, the order’s focus on the report of the court-appointed experts indicates only that the court found the report to be persuasive. 1 App. 99. Supported by the persuasive report of two neutral experts, the court reasonably concluded that Panetti’s meager evidence deserved no mention. See Part II-A, supra. In my view, the state court fairly implemented the procedures described by Justice Powell’s opinion in Ford — to “receive evidence and argument from the prisoner’s counsel.” 477 U. S., at 427. At the very least, the state court did not unreasonably apply his concurrence. See 28 U. S. C. § 2254(d)(1).
3
Because it cannot dispute that Panetti had an unlimited opportunity to present evidence, the Court argues that the state court “failed to provide petitioner with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts.” Ante, at 951. According to the Court, this opportunity was denied to Panetti because the state court failed to rule explicitly on his motions and failed to warn him that he would receive no *975 evidentiary hearing.[9] This position has no factual basis. After the court-appointed experts submitted their report, the state court made it clear that the case was proceeding to conclusion and that Panetti’s counsel needed to submit anything else he wanted the judge to consider:
“It appears from the evaluations performed by Dr. Mary Anderson and Dr. George Parker that they are of the opinion that Mr. Panetti is competent to be executed in accordance with the standards set out in Art. 46.05 of the Code of Criminal Procedure.
*976 “Mr. Gross, if you have any other matters you wish to have considered, please file them in the case papers and get me copies by 5:00 p.m. on May 21, 2004.” Letter from District Judge Stephen B. Abies in Cause No. 3310 (May 14, 2004), 1 App. 77-78.
Panetti's counsel got the message. Far from assuming that there would be a hearing, ante, at 951-952, counsel renewed his motion requesting a competency hearing and his motion seeking state funding for a mental health expert. 1 App. 96-98. Panetti’s filing indicates that he understood that no hearing was currently scheduled and that if he wanted to convince the state court not to deny relief, he needed to do so immediately. See id., at 80-95. The record demonstrates that what Panetti actually sought was not the opportunity to submit additional evidence — because, at that time, he had no further evidence to submit — but state funding for his pursuit of more evidence. See Ex Parte Motion for Mental Health Expert, id., at 54; Ex Parte Motion for Investigator; Defendant’s Motion for Appointment of Counsel to Assist Him in Article 46.05 Proceedings in Cause No. 3310 (Feb. 19, 2004), id., at 45; Panetti’s Response to Show Cause Order in Case No. A-04-CA-042-SS (WD Tex., June 3,2004), p. 5; cf. Order of Jan. 30, at 4. This Court has never recognized a constitutional right to state funding for counsel in state habeas proceedings — much less for experts — and Texas law grants no such right in Ford proceedings. E. g., Ex parte Caldwell, 58 S. W. 3d, at 130 (holding that funding for counsel or experts in Article 46.05 proceedings is at the discretion of the district court); Coleman v. Thompson, 501 U. S. 722, 755 (1991) (noting that there is no constitutional right to state-funded counsel in state habeas cases).
In short, there is nothing in the record to suggest that Panetti would have submitted any additional evidence had he been given another opportunity to do so. Panetti never requested more time to submit evidence and never told the *977 court that he wanted to submit additional evidence in the event that his requests for fees were denied. Panetti’s track record of submitting no new evidence in his first Article 46.05 motion, n. 6, supra, and only two insubstantial exhibits in his second, Part II-A, supra, suggests that it was highly unlikely that Panetti planned to present anything else. Accordingly, the state-court proceedings to evaluate Panetti’s insanity claim were not “contrary to, or ... an unreasonable application of, clearly established Federal law,” 28 U. S. C. § 2254(d)(1).[10]
C
Because the state court did not unreasonably apply Justice Powell’s procedural analysis, we must defer to its determination that Panetti was competent to be executed. See ibid. Thus, Panetti is entitled to federal habeas relief only if the state court’s determination that he is compe *978 tent to be executed “was contrary to, or involved an unreasonable application of,” Supreme Court precedent or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” § 2254(d). Not even Panetti argues that this standard is met here.
Applying Justice Powell’s substantive standard for competency, the state court determined that Panetti was competent to be executed, 1 App. 99; see also Tex. Code Grim. Proc. Ann., Art. 46.05(h), a factual determination that is “presumed to be correct,” § 2254(e)(1). That factual determination was based on an expert report by two doctors with almost no evidence to the contrary. See Part II-A, supra. Hence, Panetti is not entitled to federal habeas relief under §2254.
Ill
Because we lack jurisdiction under AEDPA to consider Panetti’s claim and because, even if jurisdiction were proper, the state court’s decision constitutes a reasonable application of federal law, I will not address whether the Court of Appeals’ standard for insanity is substantively correct. I do, however, reject the Court’s approach to answering that question. The Court parses the opinions in Ford to impose an additional constitutional requirement without undertaking any Eighth Amendment analysis of its own. Because the Court quibbles over the precise meaning of Ford’s opinions with respect to an issue that was not presented in that case, what emerges is a half-baked holding that leaves the details of the insanity standard for the District Court to work out. See ante, at 960-962. As its sole justification for thrusting already muddled Ford determinations into such disarray, the Court asserts that Ford itself compels such a result. It does not.
The four-Justice plurality in Ford did not define insanity or create a substantive standard for determining competency. See 477 U. S., at 418 (Powell, J., concurring in part *979 and concurring in judgment) (stating that “[t]he Court’s opinion does not address” “the meaning of insanity”).[11] Only Justice Powell’s concurrence set forth a standard:
“[No State] disputes the need to require that those who are executed know the fact of their impending execution and the reason for it.
“Such a standard appropriately defines the kind of mental deficiency that should trigger the Eighth Amendment prohibition. If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.” Id., at 422.
Because the issue before the Court in Ford was actual knowledge, not rational understanding, ibid., nothing in any of the Ford opinions addresses what to do when a prisoner knows the reason for his execution but does not “rationally understand” it.
Tracing the language of Justice Powell’s concurrence, the Court of Appeals held that Panetti needed only to be “‘aware’ of” the stated reason for his execution. Panetti v. Dretke, 448 F. 3d 815,819 (CA5 2006). Implicitly, the Court of Appeals also concluded that the fact that Panetti “disbelieves the State’s stated reason for executing him,” Panetti v. Dretke, 401 F. Supp. 2d 702, 708 (WD Tex. 2004), does not render him “unaware” of the reason for his execution. The Court challenges this approach based on an expansive inter *980 pretation of Justice Powell’s use of the word “aware.” Ante, at 959-960. However, the Court does not and cannot deny that “awareness” is undefined in Ford and that Ford does not discuss whether “delusions [that] so impair the prisoner’s concept of reality that he cannot reach a rational understanding of the reason for the execution” affect awareness in a constitutionally relevant manner.[12] Ante, at 958. Nevertheless, the Court cobbles together stray language from Ford’s multiple opinions and asserts that the Court of Appeals’ test is somehow inconsistent with the spirit of Ford. Because that result does not follow naturally from Ford, today’s opinion can be understood only as holding for the first time that the Eighth Amendment requires “rational understanding.”
Although apparently imposing a new substantive Eighth Amendment requirement, the Court assiduously avoids applying our framework for analyzing Eighth Amendment claims. See Ford, supra, at 405 (first analyzing whether execution of the insane was among “those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted” in 1791); Roper v. Simmons, 543 U. S. 551, 560-561 (2005) (considering also whether the punishment is deemed cruel and unusual according to modern “standards of decency”); Atkins v. Virginia, 536 U. S. 304, 312 (2002) (looking for “objective evidence of contemporary values,” the “clearest and most reliable” of which is the “legislation enacted by the country’s legislatures” (internal quotation marks omitted)). The Court *981 likely avoided undertaking this analysis because there is no evidence to support its position.[13] See, e, g., id,, at 340-342 (Scalia, J., dissenting) (discussing the demanding standard employed at common law to show that a prisoner was too insane to be executed). The Court of Appeals at least took an approach based on what Ford actually says, an approach that was far from frivolous or unreasonable. By contrast, the Court’s approach today — settling upon a preferred outcome without resort to the law — is foreign to the judicial role as I know it.
* * *
Because the Court’s ruling misinterprets AEDPA, refuses to defer to the state court as AEDPA requires, and rejects the Court of Appeals’ approach without any constitutional analysis, I respectfully dissent.

 Section 2244(b)(2) states:
“A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
“(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
*964 “(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
“(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by dear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.”

 The Court identifies two post-AEDPA cases. Ante, at 944 (citing Slack v. McDaniel, 529 U. S. 473 (2000); Stewart v. Martinez-Villareal, 523 U. S. 637 (1998)). Because these cases were decided after AEDPA, they do not establish the pre-AEDPA meaning of “second or successive.” Moreover, these cases do not apply here. The inapplicability of Martinez-Villareal is discussed below. Infra, at 966-967. Like Martinez-Villareal, the narrow exception described in Slack is akin to a renewal of an initial application. 529 U. S., at 486-487; see infra, at 966-967 (discussing Martinez-Villareal). Even the Court does not maintain that Slack applies to Panetti’s claim.

 If, as the Court asserts, "second or successive” were a pre-AEDPA term of art that excepted Ford claims, it would be difficult to explain why, immediately following AEDPA’s passage, Courts of -Appeals uniformly considered subsequent applications raising Ford claims to be “second or successive” under §2244. See In re Medina, 109 F. 3d 1556, 1563-1565 (CA11 1997) (per curiam); In re Davis, 121 F. 3d 952, 953-955 (CA5 1997); see also Martinez-Villareal v. Stewart, 118 F. 3d 628, 630-631, 633-634 (CA9 1997) (per curiam) (finding §2244 applicable but allowing a Ford claim to proceed where it was presented in the initial habeas application).
The Courts of Appeals uniformly continue to hold that §2244 applies to successive habeas applications raising Ford claims when the initial application failed to do so. See, e. g., Richardson v. Johnson, 256 F. 3d 257, 258-259 (CA5 2001); In re Provenzano, 215 F. 3d 1233, 1235 (CA11 2000); Nguyen v. Gibson, 162 F. 3d 600, 601 (CA10 1998) (per curiam).

 The Court claims that Martinez-Villareal “suggest[s] that it is . . . appropriate, as a general matter, for a prisoner to wait before seeking resolution of his incompetency claim.” Ante, at 947. But MartinezVillareal “suggest[s]” no such thing. 523 U. S., at 645. To the contrary, as the Court admits, Martinez-Villareal does not determine whether a prisoner would even be allowed to bring a Ford claim if he waits to bring it in a second petition. Ante, at 945 (citing Martinez-Villareal, supra, at 645, n.).

 To reach the tenuous conclusion that Justice Powell’s opinion constitutes clearly established federal law, ante, at 949, the Court ignores the tension between Justice Powell’s concern that adversarial proceedings may be counterproductive and the plurality’s position that adversarial proceedings are required. Compare Ford v. Wainwright, 477 U. S. 399, 426 (1986) (Powell, J., concurring in part and concurring in judgment) (stating that “ordinary adversarial procedures — complete with live testimony, cross-examination, and oral argument by counsel — are not necessarily the best means of arriving at sound, consistent judgments as to a defendant’s sanity”), with id., at 415,417 (plurality opinion) (discussing the importance of adversarial procedures, including cross-examination). Given these contradictory statements, it is difficult to say that Justice Powell’s opinion is merely a narrower version of the plurality’s view. See Marks v. United States, 430 U. S. 188, 193 (1977).

 This application was itself Panetti’s second bite at the apple in the state court on the question of his competency to be executed. Panetti had previously presented a Ford claim in state court, but the documents that accompanied that filing contained “nothing . . . that relate[d] to his current mental state.” Order in Case No. A-04-CA-042-SS (WD Tex., Jan. 28, 2004), p. 4; id., at 4 (Jan. 30, 2004) (hereinafter Order of Jan. 30) (same). As a result, the state court denied relief without a hearing, ante, *970 at 938, and the Federal District Court found no error in this determination, Order of Jan. 30, at 4.

 The Court argues that “the trial court’s appointment of mental health experts pursuant to Article 46.05(f)” “confirmed” that Panetti had made a threshold showing. Ante, at 950. But the state court made no such finding and may have proceeded simply in an abundance of caution, perhaps to humor the Federal District Court, which had “stayted] the execution [for 60 days to] allow the state court a reasonable period of time to consider the evidence of Panetti’s current mental state.” Order in Case No. A-04-CA-042-SS (Feb. 4, 2004), p. 3, 1 App. 116. In any event, the question today is not whether Panetti met Texas’ threshold but whether he met the constitutional one. The Court cannot avoid answering that question by relying on a related state-law determination.

 The Court states that Panetti’s “counsel reached the reasonable conclusion that these allegations warranted a response.” Ante, at 951. But the Court fails to note that the 17-page brief was the response. Apart from his motions, Panetti never requested the opportunity to respond further.
Panetti criticized the court-appointed experts for visiting him only once, for not conducting psychological testing, for failing to review collateral information adequately, for failing to take into account his history of mental problems, and for the abbreviated nature of their conclusions. Objections to Experts’ Report, Renewed Motion for Funds to Hire Mental Health Expert and Investigator, Renewed Motion for Competency Hearing in Cause No. 3310 (Gillespie Cty., Tex., 216th Jud. Dist., May 21,2004), 1 App. 82-95 (hereinafter Objections to Experts’ Report).

 The Court does not assert that Panetti actually had a constitutional right to an evidentiary hearing or to have any of his 10 motions granted. As discussed above, Justice Powell’s concurrence specifically rejected the Ford plurality’s contention that an adversarial proceeding was constitutionally required or even appropriate. Part II-B-1, supra. Even a cursory look at Panetti’s motions shows that the state court did not- err in refusing to grant them. This Court has never recognized a right to state-provided experts or counsel on state habeas review. Cf. Ex Parte Motion for Prepayment of Funds to Hire Mental Health Expert to Assist Defense in Article 46.05 Proceedings in Cause No. 3310 (Feb. 19, 2004), 1 App. 54 (hereinafter Ex Parte Motion for Mental Health Expert); Defendant’s Motion for Appointment of Counsel to Assist Him in Article 46.05 Proceedings (Feb. 19,2004), id., at 45; Ex Parte Motion for Prepayment of Funds to Hire an Investigator to Assist Defense Counsel in Cause No. 3310 (Feb. 19, 2004) (hereinafter Ex Parte Motion for Investigator). There is likewise no right to transcribed court proceedings, videotaped examinations, or any other specific protocols for conducting competency evaluations. Cf Motion to Videotape All Competency Examinations of Scott Panetti Conducted by Court-Appointed Mental Health Experts in Cause No. 3310 (Feb. 19, 2004); Motion to Transcribe All Proceedings Related to Competency Determination Under Article 46.05 in Cause No. 3310 (Feb. 19,2004); Motion Seeking Order Setting Out Protocol for Conducting Competency Evaluations of Scott Panetti in Cause No. 3310 (Feb. 19, 2004). And as discussed above, Panetti has no clearly established constitutional right to a formal, oral hearing, Part II-B-1, supra, much less a right to discovery. Cf. Defendant’s Motion for Discovery in Cause No. 3310 (Feb. 19, 2004); Motion to Ensure That the Article 46.05 “Final Competency Hearing” Comports With the Procedural Due Process Requirements of Ford in Cause No. 3310 (Feb. 19, 2004), 1 App. 49.

 Because the Court fails to identify any bona fide constitutional violation, it provides a laundry list of perceived deficiencies in the state-court proceedings. Ante, at 950 (“[I]t appears the state court on repeated occasions conveyed information to petitioner's counsel that turned out not to be true; provided at least one significant update to the State without providing the same notice to petitioner; and failed in general to keep petitioner informed as to the opportunity, if any, he would have to present his case”). The state court did request the name of mental health experts from the parties but ultimately chose experts without input from the parties. Ante, at 939-940. It canceled a status conference and failed to give Panetti notice. Ante, at 939. It also never explicitly ruled on Panetti’s motions despite its statements that it would do so later. Ante, at 940-941. But Panetti does not argue that the court-appointed experts were not impartial nor does he explain how the canceled status conference caused him any harm. Finally, although it might have been better for the state court to rule explicitly on Panetti’s outstanding motions, it implicitly denied them by dismissing his claim. As for the state court’s “fail[ure] to keep petitioner informed,” after the court-appointed experts’ report was issued, the judge sent a letter to counsel that made it clear that Panetti had one last chance to submit information. 1 App. 77-78. In short, none of these perceived deficiencies qualifies as a violation of any “clearly established” federal law.

 Justice Marshall’s plurality opinion in Ford did not even go so far as to state that there should be a uniform national substantive standard for insanity. It is thus an open question as to how much discretion the States have in setting the substantive standard for insanity.

 The Court points out that “the Ford opinions nowhere indicate that delusions are irrelevant to ‘comprehension]’ or ‘aware[ness]’ if they so impair the prisoner’s concept of reality that he cannot reach a rational understanding of the reason for the execution.” Ante, at 958 (brackets in original). By the same token, nowhere in the Ford opinions is it suggested that “comprehension]” or “aware[ness]” is necessarily affected when delusions impair a prisoner. The Court refuses to acknowledge that Ford simply does not resolve this question one way or the other.

 Contrary to the Court’s suggestion, the state of the factual record is not a genuine impediment to analyzing the constitutional question. See ante, at 961-962. Our Eighth Amendment framework requires relatively academic, abstract analysis. Specific facts regarding Panetti’s condition are simply irrelevant to what the Eighth Amendment requires.