**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 21, 2013

No. 08-70015
(Cons. with 08-70016)

Lyle W. Cayce
Clerk

SCOTT LOUIS PANETTI,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeals from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and OWEN, Circuit
Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A Texas jury convicted petitioner-appellant Scott Louis Panetti of capital murder and sentenced him to death. Panetti filed separate federal habeas petitions challenging his competency to be executed as well as his competency to represent himself at trial. The district court denied relief but granted a certificate of appealability. We affirm.

No. 08-70015

## I.

This case has a long and complicated procedural history. In 1992, Panetti shot his estranged wife's parents at close range, killing them and spraying his wife and three-year-old daughter with their blood. At trial, Panetti's only defense was insanity. Panetti demanded to represent himself despite his history of schizophrenia and institutionalization, ignoring the judge's repeated pleas to accept court-appointed representation and insisting that only an insane person could prove insanity. According to standby counsel, Panetti's performance was "bizarre," "scary," and "trance-like," rendering his trial "a judicial farce, and a mockery of self-representation."[1] The jury convicted Panetti of capital murder and sentenced him to death, and the Texas Court of Criminal Appeals ("CCA") upheld the conviction and sentence on direct and collateral review. Panetti eventually filed a federal habeas petition, claiming, among other things, that he was incompetent to waive counsel and incompetent to stand trial.[2] The district court denied the petition, and this Court affirmed.[3]

In October 2003, the state trial court set an execution date for February 5, 2004.[4] Panetti filed a motion with the trial court for a stay of execution, claiming for the first time that he was incompetent to be executed under Article 46.05 of the Texas Code of Criminal Procedure.[5] The trial court rejected the motion without a hearing, holding that Panetti had failed to make a "substantial showing of incompetency" as required to entitle Panetti to an evaluation by

---

[1] *Panetti v. Quarterman,* 551 U.S. 930, 936 (2007).

[2] *Panetti v. Dretke*, 401 F. Supp. 2d 702, 703 (W.D. Tex. 2004).

[3] *See Panetti v. Cockrell*, 73 F. App'x 78 (5th Cir. 2003).

[4] *Panetti*, 551 U.S. at 937.

[5] *Id.* at 938.

2

court-appointed experts under Article 46.05.[6] The CCA determined that it was without power to review the trial court's determination.[7]

Panetti then returned to federal court, filing a second federal habeas petition which asserted that the trial court's ruling on his competency to be executed violated clearly established Supreme Court precedent — specifically, *Ford v. Wainwright*.[8]   The petition included additional evidence of Panetti's mental illness, evidence that Panetti had also appended to a renewed Article 46.05 motion before the state trial court.[9]  Instead of ruling on the merits of Panetti's petition, the district court — Hon. Sam Sparks presiding — ordered Panetti's execution stayed for 60 days to give the state court time to consider Panetti's renewed motion in light of the supplemental evidence.[10]

In February 2004, the state court entered an order appointing a psychiatrist and clinical psychologist to examine Panetti, thereby implicitly finding that Panetti had made a "substantial showing of incompetency" under Article 46.05.[11]   In April, the court-appointed experts filed a joint report concluding that Panetti was competent to be executed.[12]  Panetti moved to appoint his own experts and hold an evidentiary hearing, urging that Article 46.05 and the Supreme Court's decision in *Ford* required the state court to afford

---

[6] *Panetti*, 401 F. Supp. 2d at 703.

[7] *Panetti*, 551 U.S. at 938.

[8] *Panetti*, 401 F. Supp. 2d at 703 (citing *Ford v. Wainwright*, 477 U.S. 399 (1986)).

[9] *Id.* at 703–04.

[10] *Id.* at 704.

[11] *Id.*

[12] *Id.*

No. 08-70015

him an opportunity to be heard.[13]  Without ruling on Panetti's motion, the state court entered an order finding that Panetti was competent to be executed.[14]

Panetti then returned to the federal district court, claiming that the state court's refusal to hold an evidentiary hearing and accept evidence on his alleged incompetency violated both Article 46.05 and *Ford*.[15]  The district court agreed and concluded that the state court's decision thus fell outside of the safe harbor we created in *Caldwell v. Johnson*,[16] which insulates state proceedings compliant with Article 46.05 from habeas attack under *Ford*.[17]  The district court also rejected the State's argument that Panetti's *Ford* claim was precluded by the § 2244 bar on "second or successive" habeas petitions, reasoning that Panetti could not have included the claim in his original petition, as it only became ripe when the state set an execution date.  Finally, the district court determined that since Panetti had made a "substantial showing of incompetency," the state court's failure to "receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination," was a violation of due process under *Ford*.[18] The district court then scheduled its own evidentiary hearing, appointing counsel and authorizing funds so that Panetti could hire a team of psychiatric experts.[19]

At the hearing, Panetti presented testimony from four experts, including two clinical and forensic psychologists, a clinical psychologist, and a

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] 226 F.3d 367, 374 (5th Cir. 2000).

[17] *Panetti*, 401 F. Supp. 2d at 704–05.

[18] *Id.* at 705.

[19] *Id.*

psychiatrist.[20] The experts testified that though Panetti appeared to understand the State's purported reason for seeking his execution — his murder of his in-laws — his delusions caused him to believe that the State was actually "in league with the forces of evil," seeking his execution "to prevent him from preaching the Gospel."[21] The State's two experts — a psychiatrist and a clinical psychologist — agreed that Panetti was mentally ill, though they "concluded that some portion of Panetti's behavior could be attributed to malingering."[22] While both experts testified that Panetti had the *capacity* to rationally understand the reason for his execution, they "were unable to reach a formal conclusion that he did, in fact, understand it."[23]

The district court reviewed the evidence adduced at the hearing *de novo*, observing that though the state court had made a factual determination that Panetti was competent to be executed, this determination was not entitled to AEDPA deference.[24] The court reasoned that "to apply such deference . . . would fly in the face of the Supreme Court's holding in *Ford* . . . [in which] seven Justices . . . concluded [that] denying a petitioner the right to present, as well as rebut, evidence in making a competency-to-be-executed determination violates the right to due process."[25] Turning to the evidence, the district court concluded that the record supported a finding that Panetti's delusional belief system prevented him from rationally appreciating the connection between his crimes

---

[20] *Id.* at 707.

[21] *Id.* at 709.

[22] *Id.* at 704, 707.

[23] *Id.* at 707–08.

[24] *Id.* at 705–06.

[25] *Id.* at 705.

and his execution.[26] Nevertheless, the court reluctantly found Panetti competent to be executed, noting that under Fifth Circuit precedent, Panetti only needed to "know the fact of his impending execution and the reason for it,"[27] and that here, both sides' experts agreed that Panetti was aware of his impending execution as well as the State's purported reason for that execution.[28] We affirmed in a published opinion, reemphasizing that a prisoner is competent to be executed under *Ford* if he "knew that he was going to be executed and why he was going to be executed,"[29] and noting that the "awareness" required under *Ford* "is not necessarily synonymous with 'rational understanding.'"[30]

In 2007, the Supreme Court granted certiorari and reversed.[31] As a threshold matter, the Court agreed with the district court that the statutory bar on successive habeas petitions does not apply to *Ford* claims brought when first ripe.[32] It also agreed that the state court's competency determination was not entitled to AEDPA deference, as the court had failed to afford Panetti an opportunity to present his own evidence, thereby violating the minimum due process required for competency determinations under *Ford*.[33] However, turning to the question of Panetti's competency to be executed, the Court concluded that "the [Fifth Circuit's] standard is too restrictive to afford . . . the protections

---

[26] *Id.* at 709.

[27] *Id.* (quoting *Fearance v. Scott*, 56 F.3d 633, 640 (5th Cir. 1995)).

[28] *Id.* at 711–12.

[29] *Panetti v. Dretke*, 448 F.3d 815, 819 (5th Cir. 2006) (quoting *Barnard v. Collins*, 13 F.3d 871, 877 (5th Cir. 2006)).

[30] *Id.* at 821.

[31] *See Panetti*, 551 U.S. at 962.

[32] *Id.* at 942–47.

[33] *Id.* at 948–54.

6

granted by the Eighth Amendment."[34]   The Court explained that "the *Ford* opinions nowhere indicate that delusions are irrelevant to 'comprehension' or 'awareness' if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution," concluding that "if anything, the *Ford* majority suggests the opposite."[35]  The Court nevertheless declined "to set down a rule governing all competency determinations," noting that it was "hesitant to decide a question of this complexity before the [d]istrict [c]ourt and the [Fifth Circuit] have addressed, in a more definitive manner and in light of the expert evidence found to be probative, the nature and severity of [Panetti's] alleged mental problems."[36]

On remand, the district court scheduled a second evidentiary hearing, offering both sides the opportunity to introduce additional evidence in light of the Supreme Court's decision.[37]  In anticipation of the hearing, the defense hired Dr. Leslie Rosenstein (a clinical neuropsychologist), Dr. David Self (a forensic psychiatrist), and Dr. Mary Alice Conroy (a forensic psychologist).  While Drs. Rosenstein and Self were both new to the defense, Dr. Conroy was familiar with Panetti, having interviewed him previously in anticipation of the 2004 hearing. The three experts collectively evaluated Panetti for some fifteen hours, subjecting him to extensive questioning and administering a battery of tests designed to gauge his mental health as well as the likelihood of malingering.[38] The district court ultimately authorized some $9000 to pay Panetti's experts, though it rejected his repeated requests for additional funding.

---

[34] *Id.* at 956–57.

[35] *Id.* at 958.

[36] *Id.* at 960–61.

[37] *Panetti v. Quarterman*, 2008 WL 2338498, at *2 (W.D. Tex. 2008).

[38] *See id.* at *19–22.

At the evidentiary hearing, all three defense experts testified that Panetti's cognitive functioning and behavioral patterns were consistent with schizophrenia,[39] though Dr. Conroy noted that Panetti's symptoms — pressured speech, tangential thinking, and flight of ideas — had improved markedly since her 2004 evaluation. Drs. Conroy and Self also testified that Panetti suffered from a genuine delusion that he was on death row to preach the Gospel and save souls. However, Dr. Conroy conceded that Panetti was "not as clear" or "direct" as he had been in 2004 when prompted to explain the reason for his impending execution, answering only that "I'm going to be here preaching until God calls me home" and then "going on to talk about the conspiracies between the Bushes and large corporations and demonic forces," the corruptness of his trial judge, and the perversion of a criminal justice system that sought to execute him for a crime he had committed while insane. Though Drs. Conroy and Self both believed that Panetti continued to suffer from the delusion that his execution was part of a satanic conspiracy to keep him from preaching, their opinions appear to draw on Panetti's statements in 2004.

The defense also called on two of Panetti's fellow death-row inmates to testify as fact witnesses. Willie Poindexter, who had been housed in Panetti's immediate area for about two years, testified that talking to Panetti was strange because "one minute everything's good, the next minute he's ranting and raving fire and brimstone again, like flipping a switch."[40] Poindexter noted that Panetti preached incessantly both in his cell and in the day-room — often for up to seven hours a day — even though it irritated other inmates and caused them to throw hot water on him and shout at him.[41] Randy Halprin, another fellow death-row

---

[39] *See id.* at *19–22.

[40] *Id.* at *26.

[41] *Id.*

inmate, gave a similar account of Panetti's daily routine, noting that Panetti "does a lot of fire and brimstone type preaching from the day-room."[42]

The State countered with testimony from its own team of experts, including Dr. Tom Allen (a forensic psychologist) and Dr. Alan Waldman (a psychiatrist and neurologist).[43] After interviewing Panetti as well as a number of Texas Department of Criminal Justice ("TDCJ") employees, both experts concluded that Panetti was at least partially fabricating his symptoms to thwart their attempts to administer structured examinations designed to detect malingering.[44] Indeed, Waldman doubted that Panetti suffered from any form of mental illness, opining that Panetti "is about as normal as he wants to be at any given time" and that his "dramatic presentation" during interviews "reflect[s] an individual naive to [schizophrenia] except for what is seen in television and movies."[45] Ultimately, Waldman was "emphatic in his opinion that Panetti has a rational understanding of . . . the connection between [his] crime and [his] execution,"[46] pointing to Panetti's repeated assertions that he was "unjust[ly]" convicted in spite of his insanity and that God had "forgiven" his "guilt." Waldman suggested that these statements implied that Panetti understood that the State sought to punish him because he had "do[ne] something wrong."

The State also called three TDCJ employees, apparently in an attempt to counter the fact testimony offered by Panetti's fellow inmates. Steven Bryant,

---

[42] *Id.*

[43] *See id.* at *23–25. The state also adduced testimony from Dr. Priscilla Ray, a forensic psychiatrist and neurologist who opined on the extent to which psychiatric science can assist a court in assessing a prisoner's competency to be executed. *See id.* at *26.

[44] *Id.* at *23–25.

[45] *Id.* at *25.

[46] *Id.*

who worked as a guard in Panetti's unit between 2003 and 2007, testified that while Panetti was never a problem offender, he "would [often] have some religious statement to make."[47]  William Cook, another death-row guard, testified that he saw Panetti's preaching, both in his cell and in the day room, but that it was "the same type of thing you'd hear at church . . . well thought out."[48]  Wilson Coker, a third death-row guard, testified that Panetti was generally well behaved, but that some guards would occasionally assign Panetti to a cell to get "a little revenge" on another inmate because they knew that Panetti would irritate the inmate with his constant preaching.[49]

Finally, the State presented secret audio recordings of Panetti's conversations with his parents and sister between December 4, 2007 and January 4, 2008, which the district court accurately summarized as follows:

> The[] recordings amount to some eleven hours of conversation.  In all that time, Pane[t]ti's speech remains normal, even slow, in pace. His statements are generally responsive to the conversation, though he does show remarkable self-centeredness, often turning the conversation to himself instead of following up on a topics related to friends, family, or the other speaker.  He often quotes scripture or makes religious comments, but does not "rant" or "preach."
>
> Notably, several of the conversations between Panetti and his mother involve extended discussion regarding Judge Ab[l]es (the trial judge) and his corruptness and ineptitude with regard to Panetti's trial proceedings.  In these discussions Panetti talks about the "kangaroo court," "Ab[l]es' screwups," and "corrupt Texas politics."  He makes statements such as "Fredericksburg had to have a hanging" and "Ab[l]es was trying to cover his ass."  At no time does he become irrational, tangential, or pressured in his speech. His statements all have to do with Judge Ab[l]es' alleged political corruptness, not with any spiritual corruption or action by devils or supernatural forces.

---

[47] *Id.* at *27.

[48] *Id.*

[49] *Id.* at *27–28.

No. 08-70015

The conversation between Panetti and his parents often turns to Panetti's habeas case. Panetti's comments about his legal proceedings demonstrate a fairly sophisticated understanding of his circumstances. For example, on December 4, 2007, Panetti tells his parents to tell Maury Levin, whom he identifies as a member of his defense team, about a "character witness" that he "knew from years ago that saw me run and preach and may not be here any more." He seems to be aware he may be on tape, stating "I don't want to be too overt about it . . . . I hope they don't know what I'm talking about . . . . If they are taping it, I did not tell that character witness anything, there's no in cahoots, no planning."

On December 10, 2007, Panetti initiates a very rational, organized conversation with his parents about various states abolishing the death penalty pending the outcome of the "lethal injection case" currently before the Supreme Court. Panetti notes "I've got a feeling they're in for a surprise like they were in my case." There are several other recorded conversations concerning the abolition of the death penalty generally; Panetti expresses his moral opposition to the death penalty without becoming noticeably tangential or pressured in his speech, and without attributing the death penalty to any kind of supernatural or demonic conspiracy.

On December 17, 2007, Panetti asks his parents (regarding one of the experts sent to evaluate him): "that lady or man you sent last week, was that for us or them?" His mother responds, "us," and Panetti replies "Well, that's the way I treated her, then."

Also on December 17, 2007, Panetti tells his parents not to worry about the outcome of the evidentiary hearing: "the clerks, the Supreme Court, dug deep down into that, and at the end of the opinion they said that Sparks would come up with a decision in agreement with our decision. So if they want to pull a shenanigan and send it back through there again, now don't be afraid if this hearing goes, because it's just gonna — it's just gonna be better in the end, because it's gonna go back there again and they're not gonna like it. They've done that with other cases, and the Supreme Court gets angry with Texas for doing that."[50]

Before analyzing the new evidence adduced at the second evidentiary hearing, the district court clarified its understanding of Eighth Amendment competency inquiry in the wake of the Supreme Court's remand opinion. The

---

[50] *Id.* at *28–29.

11

court read that opinion to hold that "the test for competence to be executed involves not only a prisoner's factual awareness of the crime, the impending execution, and the state's reason for executing the prisoner, but also some degree of 'rational understanding' of the connection between the crime and the punishment."[51] Moreover, the court agreed with Panetti that this standard was essentially identical to the standard for competency to stand trial under *United States v. Dusky*,[52] which probes a defendant's "rational understanding" of the connection between his crime and the charges against him.[53]

The district court then turned to apply its "rational understanding" test to the facts at hand. After reviewing the expert testimony on Panetti's competency in painstaking detail,[54] the court agreed with the defense's experts that "Panetti is seriously mentally ill" and concluded that "it is not seriously disputable that Panetti suffers from paranoid delusions of some type."[55] However, the court implicitly agreed with the State that Panetti was exaggerating some of his symptoms to avoid execution, observing that Panetti demonstrated a "fairly sophisticated understanding of his case" and that his refusal to cooperate with the State's experts stood in marked contrast to his treatment of the defense's experts.[56] Ultimately, the court determined that Panetti "has both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two,"[57] as

---

[51] *Id.* at *31.

[52] 362 U.S. 402 (1960) (per curiam).

[53] *See Panetti*, 2008 WL 2338498, at *31–32, 34.

[54] *Id.* at *18–27.

[55] *Id.* at *36.

[56] *Id.* at *35–36.

[57] *Id.* at *37.

demonstrated "most clearly" by his statements to Dr. Waldman "that the death penalty is wrong in his case because he was schizophrenic when he killed his in-laws."[58]  According to the court, Panetti's remarks imply that he "understands he is being executed to punish him for killing his in-laws, but feels the state is not justified in taking this position because of his mental illness."[59]  As "*Ford . . . does not require that a prisoner agree with his punishment — simply that he rationally understand it*," the court concluded that Panetti was competent to be executed.[60]

Panetti sought and obtained a certificate of appealability ("COA") from the district court and timely filed a notice of appeal.  However, before the parties could complete their briefing, the Supreme Court decided *Indiana v. Edwards*,[61] which qualified *Faretta* and progeny by clarifying that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness."[62]  Panetti filed a motion to stay and abate the appeal so that he could return to state court to collaterally challenge his 1995 conviction under *Edwards*.  Panetti urged that the state judge who oversaw his trial operated under the belief — erroneous, in light of *Edwards* — that he could not overrule Panetti's *Faretta* demand.  Had the judge been aware of the proper Sixth and Fourteenth Amendment standard, Panetti contended, he should have required Panetti to accept counsel.  This Court granted the motion to stay and abate and Panetti filed his second state habeas petition.  The CCA promptly denied the petition for

---

[58] *Id.* at \*36.

[59] *Id.*

[60] *Id.*

[61] 554 U.S. 164 (2008).

[62] *Id.* at 174–75.

"fail[ing] to meet the dictates of Article 11.071, § 5" of the Texas Code of Criminal Procedure.

Panetti then petitioned this Court for permission to file a third federal habeas petition raising his *Edwards* claim. In a one-sentence order, this Court granted Panetti's motion, thereby implicitly finding that Panetti had made a "prima facie showing" that his "claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."[63] While Panetti's third federal petition was pending, the CCA decided *Chadwick v. State*,[64] which addressed the meaning of *Edwards*. In light of *Chadwick*, the district court granted Panetti leave to file a second successive state habeas petition raising the *Edwards* claim. The CCA again dismissed the petition for "fail[ing] to meet the dictates of Article 11.071, § 5,"[65] and the Supreme Court denied certiorari.[66]

At length, Panetti returned to the district court to litigate his *Edwards* claim. The State moved for "summary judgment," urging that the CCA's two boilerplate § 5 dismissals rested on adequate and independent state law grounds; that *Edwards* was not retroactive under *Teague v. Lane*; and that in any event, Panetti's *Edwards* claim failed on the merits. Though the district court rejected the State's contention that Panetti's claim was procedurally defaulted, it reluctantly agreed that the claim was *Teague*-barred. Nevertheless, it adjudicated the merits *de novo*, exhaustively reviewing Panetti's trial performance and ultimately concluding that "Panetti, though unskilled and

---

[63] 28 U.S.C. § 2244(b)(3)(C).

[64] 309 S.W.3d 558 (Tex. Crim. App. 2010).

[65] *Ex Parte Panetti*, 326 S.W.3d 615 (Tex. Crim. App. 2010).

[66] *Panetti v. Texas*, 131 S. Ct. 3027 (2011).

ineffective, was not incompetent . . . to conduct trial proceedings by himself." The district court granted a COA and Panetti timely filed notice of appeal.

On appeal, Panetti contends that the district court (i) adjudicated his competency to be executed without affording him the due process required under *Ford* and the Supreme Court's 2007 remand opinion, *Panetti v. Quarterman*; (ii) erred by finding him competent to be executed; and (iii) erred by rejecting his *Edwards* claim. We examine and reject each argument in turn.

## II.

Panetti urges that the district court "violated the due process requirements of *Ford* and *Panetti* by refusing to provide constitutionally adequate funding for experts." Panetti reasons that *Ford* required the district court to afford him an "opportunity to be heard," an opportunity that, in light of *Panetti*, includes a "right to a mental health expert . . . to conduct an adequate examination . . . , review all the pertinent records, assist counsel in challenging the State's experts through cross-examination, and testify in rebuttal." The State rejoins that Panetti failed to request or receive a COA on his due process claim, and that in any event, the claim is meritless.

We agree with Panetti that the district court's COA, fairly read, encompasses his *Ford*-based due process objection.[67] Panetti raised the objection below in a motion to amend the judgment, along with his challenge to the district court's ultimate determination that he was competent to be executed. The district court granted a COA on "[w]hether Mr. Panetti is incompetent to be executed under *Ford v. Wainwright* and *Panetti v. Quarterman*." As *Ford* and *Panetti* set forth not only a substantive standard for Eighth Amendment

---

[67] *Cf. Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) ("[I]n a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." (internal quotation marks and alterations omitted)).

competency, but also minimum due process requirements courts must abide in assessing competency, the district court's COA, liberally construed, reaches Panetti's due process claim.[68]

However, we agree with the State that Panetti's claim fails on the merits. Panetti's challenge to the "constitutional[] adequa[cy]" of the district court's funding relies on the proposition that the Supreme Court's decisions in *Ford* and *Panetti* establish a constitutional *right* to expert assistance in Eighth Amendment competency-to-be-executed hearings. But reasonably read, *Ford* and *Panetti* merely establish that Panetti was entitled to an *opportunity* to present his own expert testimony before a neutral decisionmaker; after all, the critical issue in both cases was that the relevant state's procedure for determining competency permitted only the government to submit evidence.[69] And even if *Ford*'s "opportunity to be heard" requires a modicum of financial assistance in the case of indigent prisoners, the district court here eventually

---

[68] *Cf. Aldridge v. Cockrell*, 92 F. App'x 60, 72 (5th Cir. 2003) (unpublished) ("[I]n cases where a district court grants a COA with respect to the merits of a constitutional claim but the COA is silent with respect to procedural claims that must be resolved if the panel is to reach the merits, the court of appeals will assume that the COA also encompasses any procedural claims that must be addressed on appeal." (quoting *Jones v. Smith*, 231 F.3d 1227, 1231 (9th Cir. 2000); *McCoy v. United States*, 266 F.3d 1245, 1248 (11th Cir. 2001) (internal alterations omitted)).

[69] *Panetti*, 551 U.S. at 949, 951 ("[T]he[] basic requirements [of due process in *Ford* competency hearings] include an opportunity to submit evidence and argument from the prisoner's counsel . . . . [Here,] the state court . . . failed to provide [Panetti] with an adequate opportunity to submit expert evidence in response to the report filed by the court-appointed experts."); *Ford*, 477 U.S. at 430 ("If there is one 'fundamental requisite' of due process, it is that an individual is entitled to an 'opportunity to be heard.' In this case, petitioner was deprived of that opportunity [because] the Florida statute does not require the Governor to consider materials submitted by the prisoner, and the present Governor has a 'publicly announced policy of excluding' such materials from his consideration.")(Powell, J., concurring in part and concurring in judgment).

authorized some $9000 in funds, allowing Panetti to retain a team of competent experts to assist him in developing evidence of his alleged incompetency.[70]

Panetti nonetheless complains that the district court's denial of additional funding prevented his experts from "fully" reviewing the TDCJ's secret recordings and obtaining a PET scan necessary to respond to the State's allegations of malingering.[71] He relies on a 1929 opinion by then-Judge Cardozo for the proposition that "a defendant may be at an unfair disadvantage [at trial] if he is unable because of poverty to parry by his own [expert] witnesses the thrusts of those against him."[72] But as *Panetti* and *Ford* both emphasized, "a constitutional procedure [in Eighth Amendment competency hearings] may be far less formal than a trial."[73] And even assuming, *arguendo*, that Panetti was entitled to all of the due process protections afforded to a capital defendant, which include "access to a competent psychiatrist" if "sanity at the time of the offense is to be a significant factor at trial,"[74] the district court furnished Panetti with *three* competent experts — including a forensic psychiatrist — who collectively evaluated him for some fifteen hours.[75] The fact that the court did not accede to all of Panetti's demands for additional funding cannot be fairly

---

[70] *See Panetti*, 2008 WL 2338498, at *19–22. Panetti has stipulated that he is "not complaining about the competency of his experts."

[71] *See* JACK KITAEFF, MALINGERING, LIES, AND JUNK SCIENCE IN THE COURTROOM 52 (2007) ("Positron emission tomography (PET) scans are . . . a possible aid in determination of malingering. PET scans are a minimally invasive nuclear medicine imaging system that uses radiopharmaceuticals that are short lived to detect perfusion and metabolic activity in the various organ systems . . . [including] brain metabolism and function.").

[72] *Reilly v. Barry*, 166 N.E. 165, 167 (N.Y. 1929) (Cardozo, C.J).

[73] *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 427 (Powell, J., concurring in part and concurring in judgment)).

[74] *United States v. Snarr*, 704 F.3d 368, 405 (5th Cir. 2013).

[75] *Panetti*, 2008 WL 2338498, at *19–22.

characterized as an abuse of discretion,[76] particularly as his experts were able to review and respond to large swaths of the TDCJ's recordings, and as his late-arriving request for a PET scan violated the court's scheduling order.

## III.

Panetti next argues that the district court erred in finding him competent to be executed under the Eighth Amendment as read by *Ford* and *Panetti*. To evaluate Panetti's argument, we must first determine whether the district court applied the correct standard in assessing Panetti's competency — a legal question we review *de novo*. The Supreme Court's remand opinion provides only limited guidance, advising that *Ford* does not "foreclose inquiry" into whether a prisoner's psychotic delusions prevent him from attaining a "rational understanding" of the retributive basis for his execution and that such delusions "may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose."[77] The district court read the remand opinion as setting forth a mandatory "rational understanding" test for Eighth Amendment competency, a test substantially identical to the *Dusky* standard for competency to stand trial.[78] On appeal, both parties seem to agree that *Panetti* sets forth a mandatory test; however, the State challenges the district court's reliance on *Dusky* and its circuit-level progeny, urging that *Dusky*'s inquiry into a defendant's ability to assist in his defense has no place in our Eighth Amendment jurisprudence.

---

[76] *Snarr*, 704 F.3d at 404 ("We review a district court's denial of funding for expert witnesses for abuse of discretion.").

[77] *Panetti*, 551 U.S. at 958–60.

[78] *Panetti*, 2008 WL 2338498, at *31, 32–34.

No. 08-70015

We need not deviate from the parties' assumption that *Panetti* establishes a mandatory "rational understanding" test to agree with the State that *Dusky* and company should not be imported wholesale into the Eighth Amendment context. *Dusky*'s inquiry into a defendant's "rational understanding" of the charges against him is footed on the essentials of due process, probing whether a defendant "has sufficient present ability to consult with his lawyer to assist in his defense."[79] *Panetti*'s inquiry into a prisoner's "rational understanding" of the basis for his execution arises out of conceptually distinct Eighth Amendment concerns, including "the [questionable] retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life" and "the natural abhorrence civilized societies feel at the killing of one who has no capacity to come to grips with his own conscience or deity."[80] As it is not self-evident that the level of understanding necessary to assist in one's defense serves the retributive aims of the death penalty, *Dusky* and progeny do not necessarily provide an appropriate metric for determining competency to be executed.

However, we do not read the district court's references to *Dusky* as meaningfully influencing its competency determination, as its actual analysis of Panetti's "rational understanding" rested exclusively on the language and retributive rationale of the Supreme Court's remand opinion.[81] That is, the district court found Panetti competent because he "has both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two," an understanding "most clearly

---

[79] *Dusky*, 362 U.S. at 402; *see also, e.g.*, *Lafferty v. Cook*, 949 F.2d 1546, 1556 (10th Cir. 1991).

[80] *Panetti*, 551 U.S. at 957 (quoting *Ford*, 477 U.S. at 409–10).

[81] *See Panetti*, 2008 WL 2338498, at *34–37.

demonstrated" by his "rationally articulated position that his punishment is [morally] unjustified" in light of his insanity at the time of his offense.[82] Satisfied that the district court applied the correct legal standard in assessing Panetti's Eighth Amendment competency, we turn to address whether the district court's ultimate finding of competency is clearly erroneous in light of the evidence adduced at Panetti's competency hearing.[83] We conclude that it is not.

First, the expert testimony on Panetti's "rational understanding" of his punishment is conflicting, a circumstance that is probably itself sufficient to sustain the district court's judgment under a clear-error standard.[84] The State's chief expert — Dr. Waldman — doubted that Panetti suffered from any form of mental illness and was "emphatic in his opinion that Panetti has a rational understanding of . . . the connection between [his] crime and [his] execution,"[85] pointing to Panetti's oft-vocalized belief that he should not have been convicted in light of his insanity.[86] While the defense's experts countered that Panetti genuinely believed that his impending execution was part of a satanic conspiracy to keep him from preaching, even they acknowledged that Panetti no longer clearly expressed this delusion when interviewed in December 2007. The district court reviewed this conflicting testimony in painstaking detail,[87] agreeing with the defense that Panetti was "seriously mentally ill" but crediting the State's position that his competency was evidenced "by his rationally articulated

---

[82] *Id.* at *36–37.

[83] *See Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir. 2004).

[84] *See, e.g.*, *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 279 (5th Cir. 2008) ("An appellate court owes great deference to the findings of the trial court with respect to duly admitted expert testimony.").

[85] *Panetti*, 2008 WL 2338498, at *25.

[86] *Id.*

[87] *See id.* at *19–27.

position that . . . the State should not execute him because he was mentally ill when he committed the murders."[88] The court's careful draw on the experts' conflicting testimony is entitled to "great deference" from this Court.[89]

Second, the TDCJ's secret recordings of Panetti's conversations with family members generally corroborate the testimony of the State's experts. Panetti converses normally for some eleven hours and demonstrates a remarkably sophisticated understanding of his capital case, supporting the State's allegations of malingering. For example:

- On December 4, 2007, Panetti tells his parents to notify Maurie Levin (the co-director of the University of Texas capital punishment clinic) about a "character witness" that Panetti "knew from years ago that saw me run and preach and may not be here anymore." Panetti seems to be aware that he may be on tape, stating "I hope they don't know what I'm talking about . . . . If they are taping it, I did not tell that character witness anything, there's no in cahoots, no planning."

- On December 10, 2007, Panetti tells his parents about the death-penalty moratorium in the wake of the Supreme Court's grant of certiorari in "the lethal injection case," *i.e.*, *Baze v. Rees*,[90] noting that he had "a feeling they're in for a surprise like they were in my case."

- On December 17, 2007, Panetti predicts that the Supreme Court will once again grant certiorari if this Court rejects his *Ford* claim, noting that "the clerks, the Supreme Court, dug deep down into that [in the remand opinion], and the end of the opinion they said that Sparks would come up with a decision in agreement with our decision. So if they want to pull a shenanigan and send it back through there again, now don't be afraid if this hearing goes, because it's just gonna — it's just gonna be better in the end, because it's gonna go back there again and they're not gonna like it. They've done that with other cases, and the Supreme Court gets angry with Texas for doing that."

---

[88] *Id.* at *36.

[89] *McClain*, 519 F.3d at 279.

[90] 553 U.S. 35 (2008).

No. 08-70015

Panetti also demonstrates that he has thought about the death penalty and its moral and political implications, corroborating the State's experts' determination that he is capable of understanding the retributive connection between his crime and his punishment. For example:

- On December 4, 2007, Panetti observes that "in the Old Testament God says the greatest part of justice is mercy. And in the Old Testament when it comes to the death penalty, you — you gotta have two or more eyewitnesses. This is in the Old Testament law, and there were many cities in refuge. Where if there's any question of someone accidentally or unknowing [sic] kills somebody, they can go to that city of refuge."

- On the same date, Panetti reflects on the likelihood that the 2008 election may lead to changes in capital punishment, observing that "it depends on whoever gets the nomination," that "from what I heard on the news today, Hillary's for the death penalty," and that "[indecipherable] percentage is against the death penalty." When Panetti's mother suggests that Hillary "works for the Jewish people in her state" and that Jewish people "believe eye for an eye, tooth for a tooth," Panetti disagrees, urging that "[m]ost all Jewish people, because of the Holocaust, are very much against the death penalty."

Finally, and most importantly, Panetti attributes his capital conviction to his trial judge's political corruption and the peoples' desire for retribution, corroborating the State's experts' conclusion that he *actually* understands the reason for his punishment. Among other things, Panetti characterizes his competency-to-stand-trial hearings as "kangaroo" courts, complains about his trial judge's "screwups" and involvement in "corrupt Texas politics," and suggests that he was convicted because "[the trial judge] had to have a hanging" and "Fredricksburg had to have a hanging." Not once does Panetti indicate that the State is seeking his execution to prevent him from "preaching the Gospel," as his delusions allegedly cause him to believe.

For the first time in his reply brief, Panetti urges that the district court erred in "placing game-changing weight" on the TDCJ's secret recordings, citing recent state- and district-level decisions for the proposition that Eighth

22

No. 08-70015

Amendment competency determinations should rely on "probing questions by experts in a structured competency examination."[91]  But as one of the State's expert's testified without contradiction below, "there is yet no reliable objective [psychiatric] test to assess what one believes in the absence of *demonstrated understanding*," supporting the district court's first-hand consideration of Panetti's conversations.[92]  More importantly, Panetti's three experts spent some fifteen hours asking him "probing questions" about his delusional belief system, and the district court carefully considered their findings — as well as the State's experts' conflicting accounts — in reaching its competency determination.[93]  The mere fact that the court considered the TDCJ's recordings in determining whose experts to credit is not clear error, nor do the cases cited by Panetti suggest otherwise.  For example, in *Billiot v. Epps*,[94] the district court relied in part on the prisoner's "appearance at [the competency] hearing," which was "consistent with [his expert's] opinion that [his] condition will likely continue to worsen, and [that] his prognosis is bleak."[95]  Tellingly, Panetti himself relied on fact testimony from his fellow death-row inmates to corroborate the testimony of his experts at his second competency hearing.

## IV.

The final issue for review is whether Panetti is entitled to relief from his 1995 conviction under the Supreme Court's 2008 decision in *Indiana v. Edwards*,

---

[91] Specifically, Panetti relies on *Billiot v. Epps*, 671 F. Supp. 2d 840 (S.D. Miss. 2009), and *Pennsylvania v. Banks*, 29 A.3d 1129 (Pa. 2011).

[92] *Panetti*, 2008 WL 2338498, at *26 (emphasis added).

[93] *See id.* at *19–23.

[94] 671 F. Supp. 2d at 881–82.

[95] *Id.* at 882.

which clarified that a state court has discretion to "insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness."[96]  The district court concluded that Panetti's *Edwards* claim was *Teague*-barred, or, in the alternative, failed on the merits. For the first time on appeal, the State contends that Panetti's claim is barred by 28 U.S.C. § 2244, also urging that the district court should have held the claim procedurally defaulted.  As we agree that Panetti's *Edwards* claim is *Teague*-barred, we do not reach the State's alternative arguments.[97]

Under *Teague v. Lane*,[98] a federal habeas court can apply a new rule of constitutional law retroactively only if the rule (i) "places a class of private conduct beyond the power of the State to proscribe" or (ii) is a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding."[99]  Here, both parties agree that *Edwards* announced a "new rule" of criminal procedure, and the only issue in dispute is whether this rule falls within the second, "watershed" exception to *Teague*'s retroactivity bar. The Supreme Court has instructed that a new rule qualifies for "watershed" status only if it (i) "[is] necessary to prevent an impermissibly large risk of an

---

[96] 554 U.S. at 174–75.

[97] Because Panetti's *Edwards* claim fails under a *de novo* application of *Teague*'s retroactivity bar, we need not and do not opine on the interaction between AEDPA and *Teague*. *Cf., e.g., United States v. Quiroga-Hernandez*, 698 F.3d 227, 228 n.2 (5th Cir. 2012) ("Because Hernandez's argument fails even under de novo review, we need not decide whether the plain error standard applies.").  At least one panel of this Court has held that *Teague* must be viewed and applied through the deferential AEDPA lense. *See Cockerham v. Cain*, 283 F.3d 657 (5th Cir. 2002) (holding that unless the Supreme Court has itself "clearly established" that a new rule is retroactive under *Teague*, the new rule "c[an]not be considered with regard to [§ 2254(d)] petitions").  However, other panels have applied *Teague* without reference to AEDPA. *See, e.g., Lave v. Dretke*, 444 F.3d 333, 334–36 (5th Cir. 2006).  The Supreme Court has suggested that *Teague* requires a "threshold . . . analysis" that is "distinct" from AEDPA. *Horn v. Banks*, 536 U.S. 266, 272 (2002).

[98] 489 U.S. 288 (1989).

[99] *Saffle v. Parks*, 494 U.S. 484, 494–95 (1990) (quoting *Teague*, 489 U.S. at 311).

No. 08-70015

inaccurate conviction" and (ii) "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding."[100] As the district court observed, *Edwards* appears to satisfy the first element of this test: after all, the *Edwards* Court itself cautioned that "insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial."[101]

However, for a new procedural rule to amount to the sort of previously unrecognized "bedrock" constitutional principle entitled to retroactive application, it must effect a sea change in criminal procedure comparable to that wrought by *Gideon v. Wainwright*,[102] which afforded all felony defendants a right to counsel at trial.[103] The Supreme Court "ha[s] not hesitated to hold that less sweeping and fundamental rules" do not qualify,[104] emphasizing that the second *Teague* exception is "extremely narrow" and that it is "unlikely" that new procedural rules will emerge that fall within it.[105] Though *Edwards* reflects an important shift in the Supreme Court's jurisprudence on a criminal defendant's *Faretta* right to self-representation,[106] the change is hardly as "sweeping and

---

[100] *Whorton v. Bockting*, 549 U.S. 406, 418 (2007) (citations omitted) (internal quotation marks omitted).

[101] *Edwards*, 554 U.S. at 176–77.

[102] 372 U.S. 335 (1963).

[103] *Whorton*, 549 U.S. at 419.

[104] *Beard v. Banks*, 542 U.S. 406, 418 (2004).

[105] *Whorton*, 549 U.S. at 417–18.

[106] The Court's pre-*Edwards* decision in *Godinez v. Moran* suggested that the *Faretta* right was absolute, even if invoked by a severely mentally ill criminal defendant. *See* 509 U.S. 389, 400 (1993) ("[A] criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation.").

fundamental" as that wrought by *Gideon*'s guarantee of counsel to all felony defendants.  As the *Edwards* Court noted, its new rule applies only in the "exceptional" situation where a defendant is found competent to stand trial and elects to appear *pro se*, but is so severely mentally ill that his self-representation threatens an improper conviction or sentence.[107]   Even then, *Edwards* is permissive, *allowing* the state to insist on counsel, but not requiring that the state do so.[108]  It is thus difficult to characterize *Edwards* as "creating a bedrock Constitutional *right*" or "altering our understanding of the bedrock procedural elements *essential* to the fairness of the proceeding."[109]  Ultimately, *Edwards* is no more fundamental than the many other non-*Gideon* procedural rules that the Supreme Court has refused to apply retroactively.[110]

Panetti tries to avoid the limited scope of the *Edwards* decision by characterizing it as an extension of *Gideon*'s right to counsel.  Citing to a string of pre-*Teague* cases, Panetti observes that "the Supreme Court has found every extension of the right to counsel . . . retroactively applicable to cases on collateral review."  But even accepting Panetti's premise that all *Gideon*-extension rules should be entitled to watershed status, *Edwards* is better characterized as a *limitation* on the *Faretta* right to self-representation — a characterization Panetti himself repeatedly adopts in other portions of his briefing as well as his filings below.  Tellingly, the *Edwards* Court made no reference to *Gideon* or any of the other cases bearing on a criminal defendant's right to counsel, instead

---

[107] *Edwards*, 554 U.S. at 176.

[108] *See id.*

[109] *Whorton*, 549 U.S. at 420–21 (emphasis added).

[110] *See id.* at 418 ("[I]n the years since *Teague*, we have rejected every claim that a new rule satisfied the requirements for watershed status.").

No. 08-70015

focusing entirely on distinguishing *Faretta* and progeny.[111]  We conclude that *Edwards* is not retroactively applicable on collateral review.[112]

## V.

For the foregoing reasons, we AFFIRM the district court's denial of Panetti's second and third federal habeas petitions.

---

[111] *See Edwards*, 554 U.S. at 169–80.

[112] *Teague*'s retroactivity bar aside, it is far from clear that Panetti would be entitled to relief on his *Edwards* claim — under the deferential AEDPA standard or otherwise. *Edwards* is permissive, holding only that the Constitution does not *forbid* a state to demand representation by counsel for defendants who, though competent to stand trial, suffer from severe mental illness. *Edwards*, 554 U.S. at 167.  The *Edwards* Court never expressly held that due process is violated by a state trial court's *failure* to demand counsel in such circumstances, emphasizing that the decision to insist on counsel should generally be left to the sound discretion of the trial judge. *Id.* at 177.  As the Seventh Circuit recently observed in rejecting an *Edwards* challenge functionally identical to Panetti's on direct appeal, "to read *Edwards* to *require* counsel in certain cases" would be "a dubious reading." *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) (emphasis in original).

27